495 So.2d 1245 (1985)
STATE of Louisiana
v.
Leslie LOWENFIELD.
No. 85-KA-0255.
Supreme Court of Louisiana.
December 2, 1985.
Execution Stayed December 20, 1985.
Concurring Opinion February 6, 1986.
*1247 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., John Mamoulides, Dist. Atty., Arthur Lentini, Gregory Gremillion, Asst. Dist. Attys., for plaintiff-appellee.
John H. Craft, Indigent Defender Board, New Orleans, for defendant-appellant.
BLANCHE, Justice.
The defendant, Leslie Lowenfield, was indicted by a Jefferson Parish Grand Jury on five counts of first degree murder in violation of LSA-R.S. 14:30. After deliberation, the jury returned guilty verdicts on three counts of first degree murder and on two counts of manslaughter. LSA-R.S. 14:31. Following the presentation of evidence during the sentencing portion of the trial, the jury unanimously recommended that the defendant be sentenced to death on each of the three counts. On May 29, 1984, the defendant was sentenced to death on each of the three counts of first degree murder.
*1248 Defendant assigns twenty-one errors as the basis for his appeal before this court. Seven of these assigned errors were neither argued nor briefed.[1] In this opinion we will treat twelve assignments of error (assignments 1, 2, 3, 4, 5, 9, 10, 11, 12, 13, 17, 19) and review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix to this opinion which will comprise part of the official record in this case.

FACTS
The defendant is a native of Guyana, South America. He came to New Orleans in June of 1981, seeking employment. In July of 1981, he met Sheila Thomas, a Deputy Sheriff for Jefferson Parish. In August of 1981, Sheila Thomas and her daughter, Shantell Osborne, moved into the defendant's apartment at One Thousand Scottsdale Drive. The relationship between Thomas and the defendant proved to be a stormy one. On three occasions the victim left the defendant and returned to her mother's home. Each separation became increasingly bitter and acrimonious.
The final time a break up of their relationship occurred was in June or July of 1982, at which time Ms. Thomas returned to her mother's home on Robinson Street. Subsequent to this separation, the defendant harassed the victim and frequently complained to others about Thomas' conduct and that of her family. The defendant was particularly upset with her mother, Myrtle Griffin, and blamed her for influencing her daughter against him. The harassment and repeated threats finally forced Thomas to file several complaints against defendant with the Sheriff's department. The defendant was arrested on June 6, 1982 on charges of making obscene phone calls, attempted aggravated arson and resisting arrest. These claims were dismissed later when Thomas withdrew the complaint.
In the days approaching the murders, the defendant repeatedly told other people that he was going to "get" Thomas and her family. For instance, on August 26, 1982, the defendant told Veronica Stallworth, a close friend of Thomas', that he was going to, "blow Sheila's _______ brains out." (R. 1967). He told Stallworth that he was upset that Sheila had left him because, "In his country women do not leave the men." (R. 1968). Another witness, Gwendolyn Clanton, testified that on August 29th, one day before the murder, the defendant came to her apartment and told her he was going to "kill Sheila." (R. 1983). She also testified that he threatened to kill Carl Osborne and Myrtle Griffin. He felt that Ms. Griffin had interfered in his relationship with Thomas. His wish to kill Carl, the father of Sheila's daughter, was motivated by jealousy, because he had seen Thomas' car at Osborne's home. (R. 1985).
At about 5:30 p.m. on the evening of August 30, 1982, Owen Griffin, Sheila Thomas' stepfather, was sitting in a vacant lot near his home in Marrero, Louisiana, playing cards with a few of his neighbors. Suddenly shots rang out from the Griffin residence. Owen Griffin ran to the house and rushed inside whereupon more shots rang out. The neighbors called the police who arrived within a few minutes. Neither the neighbors nor the police saw anyone come in or out of the house.
When the police arrived, they entered the building and found the bodies of Owen Griffin, his wife, Myrtle Griffin, his stepdaughter, Sheila Thomas, Ms. Thomas' four year old daughter, Shantell Osborne, and Carl Osborne, the father of the child. The victims were sprawled about the living area of the house with multiple gunshot wounds. All of the victims had been shot in the head.
Found at the scene of the crime was a .38 caliber pistol and a .22 caliber semi-automatic rifle with the name Sheila written on the stock in blue ink. Ballistics tests positively identified these as the murder weapons.
*1249 At the trial Elena Cannon, a K-Mart store employee, testified that in the morning on the day of the killings, she had sold a .22 caliber semi-automatic rifle to one Leslie Lowenfield. She positively identified defendant as the buyer. Three things that helped her identification were the facts that he was her first customer of the day, that he requested the gun which held and fired the most ammunition, and his unusual accent. A handwriting expert identified defendant's signature on the federal gun registration form which Ms. Cannon had the defendant fill out.
A search of the defendant's apartment revealed a box and packaging for a .22 caliber Marlin semi-automatic rifle and a handwritten letter addressed to Sheila Thomas.[2] Also found on the sofa in defendant's apartment was a blue felt marker. This was seized because this type of pen was used to write the victim's name on the .22 caliber rifle. This type of pen was also used to write in a green notebook found on the scene of the crime. This notebook contained writings which raged against Thomas and her family for their treatment of the defendant.[3]
Diane Fauchaux, a former taxi cab driver, testified that she picked the defendant up at his apartment complex shortly before noon on the day of the crime. She had driven the defendant to the Greyhound Bus station where he mailed several packages. After this, the cabbie took defendant to Marrero where, still carrying one of his packages, defendant asked to be dropped off at the corner of Fourth and Robinson Streets, or about a block from the scene of the crime. At trial, the driver identified the defendant, remembering his accent and the details of the trip which lasted nearly an hour.
Business records of Greyhound corroborate Fauchaux's testimony. They show that shipments to New York were pre-paid by one Leslie Lowenfield at 11:55 a.m. on August 30, 1982. These packages were addressed to Winnifred Prience. Defendant later acknowledged the name and New York address to be that of his sister.
Anita Jackson testified that she received a phone call from defendant the day after the murders. According to Jackson, defendant called her and told her that he was in Alabama, and that he had killed someone. Jackson further testified that defendant said he had killed Sheila, but had not meant to kill the baby. The defendant denied knowing Jackson at all, but her name and phone number were inexplicably in the address book that defendant identified as his.
On October 5, 1982, the defendant was arrested in New York City. When arrested, he identified himself as "James Best" and denied ever having been in Louisiana. While awaiting extradition, the defendant was held on Rikers Island. While defendant was there, the surviving members of the Thomas family began receiving macabre letters. Three were addressed to "Mikel Thomas" and bore a return address of "L. Lowenfield, 923 Udica Avenue, Brooklyn, New York." One other letter was addressed to "Connie Ankloyed", (Thomas' *1250 married sister, Connie Encalade) and bore a return address of "James Best, 923 Udica Avenue, Brooklyn, New York." The letters were postmarked from Flushing, New York, through which the mail from Rikers Island is routed. The handwriting was positively identified as the defendant's. The letters contain many inculpatory statements as well as details of the crime.[4]
Also found at the murder scene was a green spiral notebook addressed "to Sheila". The notebook contained handwritten messages, threats and warnings to Sheila, her family and the police.
After the state rested the defendant presented an alibi defense. Defendant contended that he was on a bus for Jacksonville the day before the murder, and that he then went to New York. Two witnesses were presented that Lowenfield claimed he had seen, but neither remembered the defendant. He testified that he did not know Jackson, despite the fact that her name and telephone number were in his phone book in his handwriting. He said that he had not written the letters or the notebook despite the fact that they were also in his handwriting. He denied buying the gun, even though he signed the form and the application contained all his personal information.
In order to explain all of these things away, defendant persisted that someone had engaged in an elaborate charade in order to set him up.

Assignments of Error Nos. 1, 2, 3 and 4
By his first four assignments of error the defendant claims that the court should not have found the defendant competent to stand trial, nor should they have permitted the defendant to withdraw his plea of insanity. Defendant further contends that the court erred in permitting the defendant to instruct his counsel not to pursue the issue of his mental condition at either the guilt or penalty phases of the trial.
In his fourth assignment, defendant contends that the court erred in denying his counsel's motion to withdraw.
The defendant was the object of three different sanity commissions. The first was on March 17, 1983, the second February 16, 1984 and the third on May 7, 1984, shortly before trial. The first two commissions unanimously found the defendant competent to proceed. The third, composed of the psychiatrists who had made up the first and second commissions also found the defendant competent to proceed. This commission, however, was not unanimous in its findings. One of the four psychiatrists felt that defendant could not work with his attorneys because of several incidents that had caused friction between the defendant and his lawyers.[5] This psychiatrist *1251 felt that the defendant was too paranoid to assist his attorneys, but testified that he could not say that defendant had a mental disease or defect.
The other psychiatrists agreed that the defendant was "paranoid in the extreme" and "primitive", but they all felt that defendant was able to assist in his defense. The trial judge ruled that under the criteria of State v. Bennett, 345 So.2d 1129 (La. 1977), the defendant was competent to proceed.
Immediately after the sanity hearing, the defendant took the stand. He did this by his own request in order to have it placed on the record that he had ordered his attorneys to withdraw the insanity pleas his first court appointed counsel had made for him at the time of the arraignment. At this time, the judge questioned the defendant closely about his decision. The defendant clearly understood the difference between the two defenses.[6] He said he was not forced or coerced into withdrawing the plea, but on the contrary, felt his attorneys were trying to force him to plead insanity. Clearly defendant understood the consequences of his decision.
The next day the defendant's counsel requested to withdraw because of the differences between the defendant and the attorneys on matters of trial strategy. The court denied the motion.
Courts must observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial. At the same time they must do this without depriving him of his due process right to a fair trial. Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). This court set out the criteria which a trial judge must use to assist him in the determination of competency in the case of State v. Bennett, supra:
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. 345 So.2d at 1138.
Each of the examining psychiatrists and the court paid special attention to these particular criteria. The defendant was examined with each criterion in mind, and with the exception of one doctor, the panel concluded that the defendant was competent to proceed. The one dissenting psychiatrist felt that the defendant only failed one criterion because he felt that defendant could not assist his attorneys. He based this conjecture on information he received as to the acrimonious relationship between *1252 the defendant and the attorneys. However, another psychiatrist examined the defendant with regard to this very point. The defendant indicated to this doctor that he would have no problems working with his counsel. None of the psychiatrists testified that the defendant had any mental disease or defect.
The defendant has the burden of establishing incapacity, because the law presumes his sanity. La.R.S. 15:432. Such incapacity must be the result of a mental disease or defect and must be shown by a clear preponderance of the evidence. La.C. Cr.P. Art. 641. State v. Machon, 410 So.2d 1065 (La.1982). A court is permitted to seek the aid of expert medical testimony on the issue, but the ultimate decision of competency is the court's alone. La.C.Cr.P. art. 647, State v. Rogers, 419 So.2d 840 (La.1982). The trial court's determination in such matters are entitled to great weight on appellate review and will not be overturned in the absence of a clear abuse of discretion.
The great weight of the evidence seems to support the court's determination. It is clear from the defendant's own explanation of his reasons for rejecting the insanity hearing that he understood the difference between the two strategies. He exhibited his ability to choose by making a clear and informed choice. During the trial, he took notes of the proceedings in order to assist his counsel. Through his clear recollection of his time in Florida, he helped his attorneys locate witnesses for his defense. None of the doctors on the sanity commission identified a mental disease or defect. It cannot be said here that the trial judge abused his discretion in finding defendant competent to assist counsel in his defense.
Once it is determined that the defendant is competent, the other assignments fall by the wayside. It appears beyond argument that when a competent defendant wishes to plead not guilty rather than not guilty by reason of insanity, and clearly understands the consequences of his choice, then the counsel must acquiesce to the wishes of his competent client. The court had no choice but to allow the defendant to withdraw his pleas and in this we find no error. Neither can there be error in allowing the defense to comply with the defendant's wish not to have his sanity examined at any point of the trial.
Finally, the defendant contends that by denying his counsel's motion to withdraw, his Sixth Amendment right to effective assistance of counsel was violated. In the recent case of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court of the United States granted certiorari to consider the standards by which to judge a contention that the Constitution requires that a criminal judgment be overturned because of the actual ineffective assistance of counsel. 462 U.S. 1105, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). In deciding that case they determined that:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. 466 at U.S. 687, 104 S.Ct. at 2064.
In the case before us the petitioner points to no lapse in counsel's performance which deprived the defendant of counsel. However, defendant claims that under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), there are certain situations which justify a presumption of ineffectiveness. It is true that *1253 Cronic, decided the same day as Strickland, set out circumstances under which the Sixth Amendment might require setting aside a conviction even though the two part demonstration required by Strickland was not made. However, we find that the circumstances urged by defendant are not within the situations envisioned by the court in Cronic.[7] Therefore, this assignment is without merit.

Assignment of Error No. 5
By this assignment of error, the defendant contends that the trial court erred in not suppressing the in-court identification of defendant by Ms. Diane Faucheux, the taxi cab driver who drove defendant to the scene of the crime. The defense contends that the manner in which the witness identified the defendant was unduly suggestive.
One of the detectives on the task force investigating the crime learned that the defendant frequently traveled by means of a cab. Following this lead, he went to the Westbank Cab Company and showed cab drivers a picture of the defendant asking if any of them recognized the defendant. Among those first shown the picture was the witness Ms. Faucheux. When shown the picture at that time she did not recognize him.
After this failed to turn anything up, the officer obtained a logbook from the cab company. In this logbook was recorded all the travels of the cabs dispatched on a particular day. The book showed that on August 30th, the day of the murders, a driver picked up a fare at apartment # 57 of the Windsor Square Apartments (the defendant's apartment at that time). The trip sheet also showed that the fare made a stop at the Greyhound Bus Station and dropped off some packages. The book finally shows that the fare was dropped one block away from the scene of the crime.
Acting on this information, the detective sought out Ms. Faucheux. He showed her the logbook and asked her if she recalled the fare. At this time she did recall her fare and the details of the trip. She remembered that he had to make several trips back and forth loading and unloading his packages and that he spoke with a foreign accent (a fact of which the officer had not apprised her). At this time the officer showed the witness a single photograph, that of the defendant, and she positively identified the defendant as her fare.
The officer then left and gave her a picture telling her to contact the police if she should ever see the defendant again. (Defendant had not yet been apprehended).
According to our jurisprudence, a defendant who seeks to suppress an identification must prove two things. First, he must prove that the identification itself was suggestive. Secondly, he must show that there was a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Chaney, 423 So.2d 1092 (La.1982).
The second factor is not present here. In discussing this factor the U.S. Supreme Court said in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977):
We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall confrontations. The factors to be considered are set out in [Neil v.] Biggers. 409 U.S. [188], at 199-200, 93 S.Ct. [375], at 382 [34 L.Ed.2d 401]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, *1254 and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
432 U.S. at 114, 97 S.Ct. at 2253.
These five factors of reliability are fully satisfied. The witness had ample opportunity to view the defendant. She looked at his face when she helped him to put the packages in the trunk at the apartment (he had to make two trips), and to take them out at the bus station. She conversed with him during the entire hour long ride, frequently looking back in the mirror. She took note of his foreign accent, and she faced him again when he paid the fare.
Additionally, if reliability is the "linchpin", this testimony is very reliable as it is corroborated by the records of the Greyhound Bus Terminal and her unprompted recollection of his unusual accent. This argument is without merit.

Assignment of Error No. 9
By this error, the defendant contends that he was prejudiced when the court excused those venire members who stated they would not consider imposing the death penalty. The defendant urges this Court to adopt the holding of the United States Court of Appeals for the Eighth Circuit in Grigsby v. Mabry, 758 F.2d 226 (8th Cir.), cert. granted; Lockhart v. McCree, ___ U.S. ___, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985). In that case the Eighth Circuit held that jurors excludable from juries under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (hereinafter referred to as WEs for Witherspoon Excludables) constitute a distinctive group in a community, and that the systematic exclusion of the Wes from petit juries constituted a denial of a defendant's right to a jury selected from a representative cross section of the community.
In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979), the United States Supreme Court stated that:
In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
Key to the determination of whether the Sixth Amendment has been violated is the finding of a distinctive group. A survey of past decisions shows those groups which the court found to be distinctive. Distinctions based on race or national origin clearly meet this test. See Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667 (1954). Women comprise such a group. Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In Thiel v. Southern Pacific Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), the court, in finding that daily wage earners were a distinct group, said that these groups include, "economic, social, religious, racial, political and geographical groups of the community."
The defendant asks this Court to recognize as a cognizable group people who are bound together by the fact that they all hold a single common attitude. That attitude is that they would not, if a conviction was returned in a first degree murder case, under any circumstances recommend the death penalty, no matter what the law and evidence dictated. We decline to adopt this view.
An attitude such as this may spring from many sources: religious convictions, political affiliation, moral philosophy, an unwillingness to accept the responsibility for the death of a man, or the fear of an uneasy conscience. Further, an attitude, like opinions and beliefs, is subject to change with time and circumstances. This may occur in some people without reason. Therefore a single attitude does not represent the kind of economic, social, religious, racial, political or geographic characteristics that underlies those groups that have been recognized as being distinctive. People from all *1255 walks of life may and do hold this same belief.[8]
Assuming arguendo that they did constitute a cognizable class the defendant would still not prevail on his sixth amendment claim, because he fails to meet the second prong of the test that, "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the numbers of such persons in the community." 439 U.S. at 364, 99 S.Ct. 668 (emphasis ours). As correctly pointed out by the four dissenters in Grigsby, the "decisions of the Supreme Court have found only a sixth amendment right to have a jury selected from a representational cross-section." 758 F.2d at 244 (Gibson, J. dissenting).
In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1978), the Supreme Court struck down as unconstitutional Louisiana's jury selection process whereby women had to register in order to be called for jury duty and men did not. In that case the court defined the Sixth Amendment cross-sectional requirement embraced by the constitutional concept of jury trial: "the Sixth Amendment affords the defendant in a criminal trial the opportunity to have the jury drawn from venires representative of the community ..." 419 U.S. at 537, 99 S.Ct. at 701. The court went on to note that:
[i]t should be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition ...
419 U.S. at 538, 99 S.Ct. at 702 (emphasis added).
Clearly, those members of what defendant claims is a "distinctive" group were included in the venire as two were eliminated from the jury for cause. Therefore to the extent that defendant's argument is based on the misconception that his particular jury must include a certain number of Wes we reject that contention.
The Supreme Court has recently reaffirmed a state's right to reject jurors for cause. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 850, 83 L.Ed.2d 841 (1985), the court recognized that, "States retained a legitimate interest in obtaining jurors who could follow their instructions and obey their oaths." (citations omitted). In Witt, the court outlined the standard for "when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would [] prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.[]" 105 S.Ct. at 852.
In this case three jurors were excluded because of their views on capital punishment. Two were excluded because they stated that they would never impose the death penalty. One was excluded because he said he would have to impose the death penalty. Under the decisions of the United States Supreme Court these jurors were properly excused for cause because they indicated they could not apply the law as charged by the court. The defendant's Sixth Amendment claim is without merit.

Assignments of Error Nos. 10 and 11
By this assignment the defendant contends that the trial judge erred in excusing a juror and not granting a mistrial when the juror, who had already taken his oath, said he had not answered a question correctly when asked his position on the death sentence.
Mr. Gilbert Hebert was sworn in as the 10th member of the jury and sequestered *1256 with the other panel members. When the court convened the following morning to begin the trial, but prior to the proceeding actually commencing, Mr. Hebert sent the judge a note which read:
One of my answers was given without full consideration. We were so preoccupied with the death penalty I didn't give enough consideration to the life sentence. If the defendant was found guilty of five first degree murders, I could not consider a life sentence.
The judge ascertained from questioning the juror that he had talked to no one else on the jury concerning his thoughts. Nor did he mention to the other jurors that he was going to write a note. The judge excused the juror.
The defense immediately moved for a mistrial on the basis of La.C.Cr.P. art. 775(6), which calls for the dismissal of a jury when false statements are made during voir dire. There is no merit to this assignment.
Here there was no false statement. The juror had not fully considered his answer, but it was not false. Further, the reconsideration of his voir dire answers occurred before trial, and as it was not communicated to the other jurors it could not have influenced them.

Capital Sentence Review
This court reviews every death sentence to determine if it is excessive. La.C.Cr.P. art. 905.9, and Louisiana Supreme Court Rule 28. In evaluating whether the death penalty is excessive in a particular case, the court determines:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Supreme Court Rules 28, § 1.

Aggravating Circumstances
The jury in its verdict found the following statutory aggravating circumstances:
(a) The victim was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness to a crime alleged to have been committed by the defendant or possessed other material evidence against the defendant.
(b) The offender knowingly created a risk of death or great bodily harm to more than one person;
The defendant contends that the aggravating circumstance, La.C.Cr.P. art. 905.4(h) is to apply only where the murder victim was a witness in an existing prosecution. Without passing on that contention we hold that there was insufficient evidence for the jury to have found this aggravating circumstance.
The only evidence introduced to support this circumstance was a bill of information filed after the victim/witness was already dead. This evidence is insufficient to prove that the defendant killed Ms. Thomas in order to prevent her from testifying against him for a crime which he was not yet charged with.
The other aggravating circumstance was well supported by the evidence. The evidence established that Lowenfield armed himself with a .22 caliber semi-automatic rifle and a .38 caliber revolver and climbed into a window to gain access to the Griffins' residence. Once inside he hid himself inside the closet and waited as the family arrived. When they were seated around the table to eat their family meal, the defendant burst out of the closet and shot everyone in the room. When the defendant opened fire there were three adults and one child in the room. Seconds later, another adult, drawn by the sound of gunfire entered the house and was killed.
We are of the opinion that the evidence is sufficient to support the conclusion that the defendant murdered the victims as part of a single consecutive course of conduct in *1257 order to punish the victims for real or imagined wrongs he felt they had perpetrated on him. The defendant, in a swift and consecutive course of conduct fired an automatic rifle and a .38 caliber gun repeatedly into a small room occupied by five people. It cannot be seriously argued that the defendant did not contemplate a great risk of death or bodily injury to more than one person.
As we stated in State v. Rault, 445 So.2d 1203 (La.1984), "Where two or more aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence of death based thereon." 445 So.2d at 1219. Therefore, we need only consider this evidence to see if it introduced an arbitrary factor into the proceedings.
Passion, Prejudice and Arbitrary Factors
By four assignments of error the defendant contends that arbitrary factors were injected into the proceedings.

Assignments of Error No. 12 and No. 19
By these two assignments, the defendant contends that the trial court erred in introducing evidence of defendant's prior criminal history.
During the penalty phase the state introduced evidence of a prior conviction of rape in Canada and evidence of pending charges involving harassment and threatening and obscene phone calls directed towards one of the victims, Sheila Thomas, the defendant's ex-girlfriend.

The Bill of Information
The bill of information was introduced in order to underpin the aggravating circumstance that one of the victims, "was a witness in a prosecution against defendant..." La.C.Cr.P. art. 905.4(h). As discussed supra, this aggravating circumstance was not proved. While the failure of an aggravating circumstance may not of itself impair the sentence, the introduction of otherwise inadmissible evidence in support of the circumstance could inject an arbitrary factor in the sentencing process. State v. Sawyer, 442 So.2d 1136, 1139 (La. 1983).
The only possible manner in which this evidence could be admissible is to show the character and propensity of the accused. In capital cases, the jury is to focus on the character and propensity of the accused together with the circumstances surrounding the commission of the specifically intended killing. La.C.Cr.P. art. 905.2. The defendant does not have to put his character at issue. As we stated in State v. Jordan, 440 So.2d 716 (La.1983), "It is axiomatic that the conviction per se puts the offender's character at issue." 440 So.2d at 720. This principle is supported by the clear language of La.C.Cr.P. art. 905.2. However that section also provides that, "[t]he hearing shall be conducted according to the rules of evidence." We interpret this to mean that only competent evidence that is relevant to the character and propensities of the accused is admissible under La.C.Cr.P. art. 905.2.
A bare bill of information filed by the district attorney charging defendant with an unrelated crime, is not competent evidence of defendant's character. As pointed out by Justice Lemmon in a case recently handed down by this court, "[t]his court has approved evidence of convictions of unrelated crimes in the penalty phase. However, this court has never made a square holding on the admissibility in the penalty phase of a capital case of evidence of an unrelated crime for which defendant has not been convicted." State v. Hamilton, 478 So.2d 123, 129-30 (La.1985).
Evidence of an unrelated crime for which defendant has not been convicted is highly relevant as to a convicted killer's character and propensities and is arguably admissible. However, this evidence must be competent, and it must be sufficient to convince the trier of fact that he did in fact commit the other crime. A bare bill of information standing alone without testimony as to the underlying facts and circumstances of the alleged other crime is insufficient and therefore inadmissible. We must now determine whether this inadmissible evidence introduced an arbitrary factor into the proceedings.
*1258 The defendant was convicted of wiping out five members of a family, including a 4 year old girl, in a fit of jealousy. Given the overwhelming enormity of the defendant's crime, it is inconceivable the additional evidence that the defendant was charged with making harassing phone calls could have prejudiced the defendant.

The Canadian Conviction
The defendant has stipulated that the documents showing the Canadian conviction for aggravated rape are authentic, and that the defendant is the same Leslie Lowenfield. However, defendant objects to the introduction of this conviction because it has not been shown that the defendant was provided with all of the constitutional protections available in the United States.
These convictions have been introduced only during the sentencing phase of the trial. This is not done to enhance the punishment, but rather to show the defendant's past criminal history in order to examine his character and propensities as required by statute. Therefore, as we stated in State v. Mattheson, 407 So.2d 1150 (La. 1981), the state does not have the burden in a sentencing hearing to affirmatively show that defendant was accorded all of his constitutional rights. The conviction serves to show that another fact finder has examined all the underlying facts and determined them sufficient to convict the defendant. This assignment has no merit.

Assignments of Error Nos. 13 and 17
By these assignments of error, the defendant urges first that the judge should have granted a mistrial when the jury indicated it could not reach a decision during the sentencing phase, and second that the trial judge should have granted a recess between the guilt and penalty phase of the trial.
The jury returned its verdict on the guilt phase of the trial at 3:04 p.m. At this time the defense moved for a 24 to 48 hour delay before beginning the sentencing phase. The trial judge denied this motion, but did recess court until 6:05 p.m. when the court took up the penalty phase.
The evidence introduced by the state at the penalty phase consisted of a certified copy of a certificate showing a conviction in Canada for aggravated rape, and a certified copy of a bill of information against Lowenfield for making harassing phone calls.
At 8:10 p.m. the judge charged the jury and they retired to deliberate. The jurors requested, and were allowed, to retire at 11:55 p.m.
The next day the jury was sent back into the jury room at 9:40 a.m. At 11:45 p.m., counsel for the defense moved for a mistrial because of the length of time the jury had been out. This motion was denied. At 3:00 p.m. the defense counsel reurged their motion when a note came from the foreman of the jury saying:
The jury is having great distress and is unable to reach a decision at this point. There is great imbalance in the voting. Please call us back in and direct the jury again as to it's responsibilities and oath it took. (signed) The Foreman. (R. 2344).
At this point the two attorneys and the judge agreed on a method to poll the jury. The jury was called back in and the following colloquy occurred:
The Court: Mr. Conzoneri, is that the vote you recently handed the Bailiff?
The Foreman: Yes it is.
The Court: Mr. Conzoneri, I'd like you to answer the question that I have and I'd like you to only answer it yes or no: Does the jury have a verdict on any count?
The Foreman: No, sir.
The Court: Ladies and Gentlemen, as I instructed you earlier if the jury is unable to unanimously agree on a recommendation the court shall impose a sentence of life imprisonment without benefit of probation, parole, or suspension of sentence.
The procedure I'm going to go through is I'm going to ask a question ... Then I'm going to pass out pieces of paper to each juror, and I'm going to ask them to write their name on the piece of paper and write your individual answer *1259 to the question on the paper. Then we'll pick that up.
The question is: I ask you if further deliberations would be helpful in obtaining a verdict. (R. 2346-47)
The question was answered in the affirmative by eight jurors and in the negative by four. Upon collecting the vote the judge had the jury leave the court room. Almost immediately the judge received a note from the jury saying that some of them had misunderstood his question and wished to be repolled. The judge returned them to the courtroom at 3:25 p.m. and asked them: "Do you feel that any further deliberation will enable you to arrive at a verdict?" (R. 2350).
This time the jury voted eleven to one in favor of further deliberation. The judge reinstructed the jury as they had requested. This instruction included the admonition that if the jury were unable to reach a verdict the court would impose the sentence of life imprisonment. (R. 2351).
The jury went back into their room and in less than an hour brought back a verdict of death on all three counts. As to the first degree murder of Carl Osborne, Myrtle Griffin and Sheila Thomas, the jury found as an aggravating circumstance that the offender intended death or bodily injury to more than one person. They found an additional circumstance in the first degree murder of Sheila Thomas in that the victim was a witness in a prosecution against the defendant and gave material assistance to the state in any investigation of the defendant.

Assignment of Error No. 13
The first issue presented by this assignment is whether the trial judge should have declared a mistrial when the jury had difficulty in reaching a decision. As frequently stated by the court it is implicit in reading article 905.8 of the Code of Criminal Procedure, that the trial judge makes the determination of when a jury is deadlocked. See State v. Monroe, 397 So.2d 1258, 1272 (La.1981). This court has rejected the construction that the court is required to declare a deadlock at the first sign of trouble. Here the trial judge took decisive action to determine whether or not the jury was indeed deadlocked. The trial judge's resolution of this issue should be upheld except upon a showing of palpable abuse of discretion. State v. Monroe, supra; State v. Governor, 331 So.2d 443 (La.1976). We find no abuse of the judge's discretion in refusing to declare a mistrial.
The second issue presented by this assignment is whether the judge coerced the jury into returning a verdict by recharging them as to the effect of a hung jury and sending them back in to deliberate. This is without merit. There is nothing in the record to suggest or indicate that the verdict was rendered as a result of any coercive influence by the court. The trial judge brought the jury out at their request. He asked them whether further deliberations would help them to decide. By a vote of 11 to 1 the jurors said it would. He then recharged them as per their request, and sent them back in to deliberate. Less than an hour later they returned a verdict. It is a well settled proposition that when the court is informed by a jury that they are having difficulty in agreeing, it is not error for the court to impress upon them the importance of the case, urge them to come to agreement, and send them back for further deliberation. State v. Governor, supra. Here the judge very carefully complied with the jury's wishes to be recharged and sent them back for deliberations. We find no error.
The final issue raised by this assignment is the defendant's contention that the jury was allowed to deliberate too long. This is without merit. The statute requires that the jurors deliberate a reasonable time. What is reasonable is within the sound discretion of the trial judge. State v. Simmons, 414 So.2d 705 (La.1982). In such a weighty matter a "reasonable time" would be a longer amount of time, not shorter. See State v. Monroe and State v. Governor, supra.
Finally, the defendant contends that the trial judge should have granted a 24 to 48 hour recess between the guilt and *1260 penalty phases of the trial. In his brief, the defendant wanted the break to allow the jurors time to "cool" given the emotion of the trial.
In denying the motion, the trial judge stated:
I'd like to state for the record that I talked with the jurors for a moment to see what their mental and physical state was. Last night, as you recall, at eight o'clock they said that they were ready to eat and they were ready to retire. In other words, they knew that they, know they felt last night and I wanted to go see whether they would be physically and mentally could continue on and in talking with them it was unanimous that they were, that they felt okay, physically, mentally and that they didn't need time to rest. So I have that at my, in my knowledge. (R. p. 2304).
Whether or not to grant a recess is a matter within the sound discretion of the trial court, and its ruling on such motions will not be reversed absent an abuse of discretion. State v. Jones, 412 So.2d 1051 (La.1982). The defendant points to no abuse of discretion and none can be found. This assignment lacks merit.

Proportionality
We must now determine whether or not the sentence is disproportionate to the penalty imposed, considering both the offense and the offender.

The Defendant
Defendant Leslie Lowenfield was, at the time of the murder, twenty-eight years old. He is a native of Guyana, South America. His father, now deceased, was a carpenter, his mother is a nurse. Defendant was one of seven children. Before leaving Guyana, the defendant completed the equivalent of a tenth grade education. He is trained to work as a pipe-fitter. The defendant is fluent in English, which is the native language of Guyana.
In 1972, defendant went to Canada. There he was convicted on a weapons charge (later overturned) and on a charge of attempted rape. He served eighteen months of a two year sentence before leaving the country in 1975.
The defendant returned to Guyana where he remained until 1979. In that year he applied for a visa to the United States. He obtained the visa by falsifying his application when he denied having been arrested, confined or convicted in his past.
The defendant moved to New York City where his mother lived. In June of 1981, he left New York for the New Orleans area. He got a job as a pipefitter at Avondale Shipyards, earning a salary of approximately $570.00 per week. He was fired in February, 1982, for leaving the job site without permission. Prior to that he had been reprimanded twice for excessive absenteeism. At the time of the murder, six months later, defendant was still unemployed.
Defendant had no history of psychiatric treatment. Psychiatrists examining the defendant found him to be angry, primitive, paranoid, and narcissistic. The defendant was convinced he was being framed. The psychiatrist who read all of the material written by the defendant said he believed the defendant was a very dangerous individual who would be highly likely to commit the same crimes again. Defendant's intelligence was estimated in the high average range.

The Crime
The defendant knew all of the victims. They were all related to his ex-girlfriend, Sheila Thomas. The defendant in killing them wiped out an extended family which spanned three generations. His apparent motive was jealousy and anger over the fact that Ms. Thomas had left him. Among the victims was a four year old child that could not have testified against him at trial.

Comparison with Similar Cases
Juries in the 24th Judicial District Court have returned the death penalty in eight cases since January 1, 1976. Five of these sentences were affirmed by this court. Three of these involved murders during armed robberies. State v. Berry, 391 So.2d 406 (La.1980); State v. Taylor, 422 So.2d 109 (La.1982); State v. Nelson, 459 So.2d 510 (La.1984). One, State v. Flowers, 441 So.2d 707 (La.1983), involved the *1261 robbery and aggravated rape of a seventy year old woman. The other, State v. Sawyer, 442 So.2d 1136 (La.1983), involved the savage torture and murder of a single victim.
None of these cases can compare with the instant case in the number of the victims or in the fact that defendant erradicated an entire family spanning three generations. Only three cases in the jurisprudence are comparable. State v. Welcome, 458 So.2d 1235 (La.1983); State v. Wingo, 457 So.2d 1159 (La.1984); and State v. Martin, 376 So.2d 300 (La.1979).
Wingo and his accomplice, Jimmy Glass, were escapees from the Webster Parish Jail. They escaped on Christmas Eve, 1982, and found their way to the home of Mr. and Mrs. Newt Brown. They robbed the home and after binding and gagging the Browns, executed them both with a .38 caliber bullet to their heads. The jury sentenced them to death and this court affirmed.
In State v. Welcome, supra, Welcome engaged in an argument with his aunt's lover over a pocket knife. As the argument escalated, Welcome began shooting at his aunt's lover. The man fled, but Welcome chased him down and shot him several more times. He then returned to the house where he taunted his aunt as he reloaded the gun. She fled and he ran her down and murdered her. The jury recommended the death sentence and this court affirmed.
In State v. Martin, supra, defendant discovered that his wife was having sexual relations with her employer, Bobby Todd. Over the course of several days he vowed to settle his score with the paramour. Finally, the defendant went to the victim's trailer where he found Todd, another man, and two women inside. He told Todd his name and began firing, killing everyone inside. During the shooting spree, defendant fired 15 shots having to reload twice. The jury recommended a sentence of death and this court affirmed the sentence.
Therefore, considering both the offender and the nature of the offense, the sentence imposed is not disproportionate to the penalty which has been imposed in similar cases.

Conclusion
We find the assignments of error with regard to the sentencing portion are without merit and we further find that the sentence was not imposed as a result of passion, prejudice or other arbitrary factors; the evidence supports the jury's finding of two statutory aggravating circumstances, and the sentence is not disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The sentence is affirmed.

DECREE
For the above and foregoing reasons, the conviction and sentence of the defendant are affirmed.
AFFIRMED
MARCUS and WATSON, JJ., concurs and assigns reasons.
DENNIS, J., concurs with reasons.
MARCUS, Justice (concurring).
I concur in affirming defendant's conviction and sentence but, contrary to the majority, consider the bill of information charging defendant with an unrelated crime (making harassing phone calls) competent evidence of defendant's character during the penalty phase of the trial.
WATSON, Justice, concurring.
I concur in affirming defendant's conviction and sentence, but I disagree with the analysis in assignments of error twelve and nineteen dealing with defendant's prior criminal history. Evidence that defendant committed an unrelated crime of which he has not yet been convicted should be admissible at the penalty phase of trial.
DENNIS, Justice, concurring.
I respectfully concur.
I concur in affirming defendant's conviction and sentence, but disagree with the analysis in assignment of error number nine, dealing with the Witherspoon issue.
*1262 The majority's reasoning is specious. If everyone in a venire with a particular characteristic is excluded systematically, the venire effectively becomes non-representative of the community. The venire itself is no longer a cross-section of the community, not just the particular jury drawn from it. As the Federal Eighth Circuit has noted, several studies have concluded that a death-qualified jury is more likely to convict. Grigsby v. Mabry, 758 F.2d 226, 232-35 (8th Cir.), cert. granted, ___ U.S. ___, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

On Motion for Stay of Execution Pending Application to the United States Supreme Court
The foregoing motion considered:
It is ordered that execution of Leslie Lowenfield by the state of Louisiana, the Department of Corrections, and any other department, agent or servant for the state of Louisiana, is hereby stayed pending timely filing and final action by the Supreme Court of the United States of America on mover's petition for writ of certiorari.
NOTES
[1] In a death case, this court, as a matter of policy, will review all assignments whether briefed or not. State v. Celestine, 443 So.2d 1091 (La.1983); State v. Narcisse, 426 So.2d 118 (La.1983).
[2] The defendant's state of mind can be gleaned from an excerpt:

... [y]our mother teach you all her bad ways ... and now you have all her [w]horing ways ... I gave you all my money I had work[ed] for and now you want to play Big Shot, you [th]ink I do not know all you did to me But I [k]new your mother let you put [th]ings in my Food, and then you do not want to eat, you are not hungry, But Sheila, remember this, I got your hair your drass [dress?] and more, I can hurt you at any time. So I will keep in touch with Friends just to hear about what you are saying and I can make you go to your grave So [don't] you push it I leave you still brea[th]ing and your baby So lets keep it that way ... Be glad I did it this way You and Shantell and Carl and Ray still Breathing ... You Fuck with me and I will make you and Shantell go in the grave yard ... (State Exhibit # 109).
[3] The notebook warned that "no one fuck Leslie around ..." and that he, "just cannot take it any more." God send me to fix Sheila ass," "You want to go and fuck around then put the police on me each time. No bitch it do not work like that you and me will have to be dead," and "Don't fuck with me any more your mother tell you what to put in my food to get my money but she forgot to tell you that when a woman [g]ive a man shit to eat that same man does kill her ass." (State # 91).
[4] The letters were very rambling, but selected excerpts from each will show the general contents:

... Everyone is looking that I killed 5 people But know one know But me and them and that is why God made me got all 5 of them without them getting me. All I will say [is] a mouse can be a killer when you ride him ... (State # 84, p. 2).
... Know one will get [have?] Sheila if I could not get her ... I loves her and this [is] why I kill her ... Shantell get shot when Carl put her in front of him so he think I was playing when I said he and Sheila Fuck up my life ... (State # 86, p. 1).
... if you keep in this world and people keep on like what these bitches Did to me in Louisiana I will have to kill more and more. Because I know I work for my money and then people played the Love game that they in love just to took me for what I got ... (State # 85 (pp. 2, 3).
... Just to let you all know when Sheila get shot and her mother got shot all the people they have done bad things too Sheila and her mother had to called all of them before they leave this earth. So they did not go easy. I had to help the bitch by sho[o]ting her twice to let her stop with the names in her last moments ... (State # 85 p. 4).
... if he [one of Thomas' brothers] was not behind bars I would have stayed in that house and let him have his box too. But I knew he was JPCC [Jefferson Parish Correction Center], so I get whom I wanted the most and So I leave ... (State # 85 p. 5).
[5] For instance, on March 14, the defendant moved to recuse Wayne Walker, one of his court appointed lawyers. He accused Mr. Walker of having brought the Jefferson Parish District Attorney, John Mamoulides, into his jail cell disguised as a psychologist. He also accused Walker of trying to set him up. Further friction was caused by defendant's insistence of an alibi, rather than an insanity defense. The motion to recuse Walker was denied.
[6] The defendant testified:

... I plead not guilty and my reason for pleading not guilty is that I wasn't in the State of Louisiana in August ... August 30, 1982, the day I was accused of a crime.... I wished not to plead not guilty by reason of insanity because reason of insanity is telling the court that this person did something he wasn't responsible for something. And to the best of my knowledge I never had no mental illness in my whole entire life and up to this moment I do not have any mental problems. And I advised him to withdraw the plea because it's telling, you're telling the court plainly to plead reasonable insanity. You're looking for a way out ... (Trial Transcript at pp. 851-52.)
[7] In Cronic, the court held that in examining the circumstances, and whether or not they were of such magnitude that the accused was denied effective assistance of counsel, the focus was to be on the adversarial process itself and not on the accused's relationship with his lawyer as such. 466 U.S. at 657, 104 S.Ct. at 2046, fn. 21. All of the circumstances pointed out by defendant in brief relate directly to the defendant's relationship with his attorney, and therefore are clearly not within the parameters of Cronic.
[8] A glance at the Gallup Report for February of 1985 will illustrate the mutuability of this attitude. The Gallup Report has been published monthly since 1965 by the Gallup Poll, Princeton, New Jersey. In 1966 those who opposed the death penalty for whatever reason comprised 47% of the population. In 1972 only 32% opposed the death penalty. In 1985 only 20% opposed and 72% of Americans favored the death penalty. It is important to keep in mind that WEs would be a group even smaller than this, because not all who oppose the death penalty are excludable under Witherspoon.