[,ARMSTRONG, Judge.

STATEMENT OF THE CASE

On July 8, 1993, the defendant, Allen Anear, was indicted for the first degree murder of Ricky Elzey, during the perpetration or attempted perpetration of an armed robbery, in violation of La. R.S. 14:30(1). At his arraignment on July 14, 1993, the defendant entered a plea of not guilty. After a suppression hearing on November 5, 1993, the trial court denied the defendant’s motion to suppress evidence. On June 14, 1995, after a jury trial, the defendant was convicted of second-degree murder. The trial court denied the defendant’s motion for new trial on July 6, 1995. At the sentencing hearing held on July 14, 1995, the defendant was *271 sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. On February 18, 1997, the defendant requested and was granted an out of time appeal.[1]

STATEMENT OF THE FACTS

In 1993, Tanisha Washington was living with the victim, Ricky Elzey at 1106 South Rocheblave Street. They had a child together. Ricky sold cocaine and heroin for a living. On April 5, 1993, he had purchased a stash of cocaine. Ricky gave Tanisha the cocaine and told her to put it on the top shelf in his room. The witness knew that Ricky kept money in the house but did not know where it was kept. Ricky owned a Pontiac Sunbird. Kirt Jenkins was the only person Ricky would allow to drive the vehicle. In fact, Kirt had been using the vehicle before Ricky was killed. Two days before the shooting, Tanisha saw the defendant in the Calliope Housing Development. The defendant was wearing a striped polo shirt, blue jeans, and yellow Balli Mirages. The next day, the defendant was wearing the same-clothes. On April 5, 1993, the defendant was wearing the same clothes. Tanisha and Ricky knew the defendant from high school and around the neighborhood.
Around 12:15 a.m. on April 6, 1993, Ricky’s grandmother, who lived with them, was talking to Ricky. Ricky stated he was going to pull the car around and they were going to his mother’s house. When Ricky came back in, a man wearing a black ski mask and black gloves was with Ricky. The suspect was carrying an AK-47 and asked where the drugs were kept. At that point, Tanisha recognized the defendant as the person in the ski mask. The defendant was wearing the same clothes from the past two days. Tanisha also recognized the defendant by his voice and high shoulders. The defendant called her by her nickname “Shorty.” Ricky took the drugs from the top shelf and gave it to the defendant. There was about five hundred dollars worth of cocaine. The defendant then had Ricky walk through the apartment and pull out all the telephone wires. As the defendant and Ricky |3were leaving the apartment, Ricky told the witness that it was the defendant in the mask. The witness looked out the window overlooking the driveway. She saw the defendant, Ricky, Kevin Randall and some guy in a mask get in Ricky’s car and leave. Fadalli Pope was with the other men but did not get in the car. A few minutes later, the witness saw Fadalli Pope in a car with Kenny Davis and Lester Marshall.
In the early evening hours of April 5, 1993, Ricky Elzey picked up his cousin, Lynwood Ashley, and they took a ride to the Calliope Housing Development. Kirt Jenkins was also in the car. On their way back, they saw Fadalli Pope and gave him a ride. Ricky stopped to purchase cocaine. Lynwood, Fadalli and Kirt stayed in the vehicle. They then dropped off Fadalli on Galvez Street and went home. Lynwood was at home when Ricky was killed.
Dr. Richard Tracy, a pathologist with the Orleans Parish Coroner’s Office, reviewed the report of the autopsy performed on the victim by Dr. William Newman. The victim suffered multiple gunshot wounds, one of which passed through the aorta and caused immediate death. One bullet and several bullet fragments were retrieved from the victim’s body.
Detective Byron Adams was the primary investigator in the murder of Ricky Elzey. Elzey had been found dead in the 1300 block of South Roman Street. When the officer arrived on the scene, the victim’s jacket was lying in the middle of the block. *272 The victim sustained numerous gunshot wounds to the legs and buttock area. There were numerous casings on the ground. The victim’s vehicle was discovered the next day.
Officer Luther R'andall of the New Orleans Police Department Crime Lab responded to the call in the 1300 block of South Roman Street. Officer Randall | ¿took photographs and collected evidence, including twelve rifle casings, a piece of cast iron furniture and a starter jacket. Officer Kenneth Leary, a firearms examiner, examined the twelve casings found on the scene. The casings were fired by the same weapon, an AK-47. Officer Teddy Fambro processed the crime scene at 1106 South Rocheblave and the victim’s vehicle. The officer photographed the scene and the vehicle, and processed the vehicle for fingerprints. He obtained sixteen partial fingerprints from the vehicle. Officer Raymond Loosemor, a latent fingerprint examiner, testified that he was able to identify four of the fingerprints taken from the vehicle. Three of the fingerprints belonged to Kirt Jenkins. A fingerprint found on the interior of .the right rear window belonged to the defendant. Nine of fingerprints were not suitable for comparison. Three prints were not identifiable.
Trinia Thompson, the defendant’s cousin, stated that she knew the victim. The victim sold drugs in the courtyard from his vehicle. On occasion, she has seen the defendant go up to the car. Ms. Thompson also stated that the defendant would change his clothes on a daily basis. Shannon Watson, another of the defendant’s cousins, testified that the defendant slept at his sister’s house on the night in question. Ms. Watson was at the defendant’s sister’s house on the night in question and observed that the defendant was at the sister’s house from at least 10:00 p.m. to 3:30 a.m. when she left. Dionne Harrel, the defendant’s sister, also verified that the defendant arrived at her house at approximately 10:00 p.m. on April 5, 1993. He ate supper and went to sleep. The defendant did not leave the house that evening.

Errors Patent

A review of the record for errors patent reveals none.

DISCUSSION

\ ¿Assignment of Error No.l

In his first assignment of error, the defendant contends the state failed to produce sufficient evidence to establish his identity as the perpetrator of the crime.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
 In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.
The defendant’s identity was established through Tanisha Washington’s testimony. She identified the defendant by his voice and clothing. Ms. Washington stated that she and the victim knew the defen *273 dant from high school and around the neighborhood. Defendant’s own witnesses acknowledged that the defendant knew the victim. He would stand by the victim’s vehicle while the 1 ¿victim sold drugs from the car. Ms. Washington testified she recognized the defendant by his voice, the clothing that he had been wearing for the past few days and his high shoulders. Defendant contends that Ms. Washington’s testimony is not credible as his witnesses established that he changed his clothes on a daily basis. As there was a conflict between the testimony of Ms. Washington and defendant’s witnesses, the jury was well within its discretion in choosing to accept Ms. Washington’s testimony over that of the defendant’s witnesses. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the jury’s trial function. State v. Brumfield, 93-2404 (La.App. 4th Cir. 6/15/94), 639 So.2d 312. Ms. Washington’s testimony was sufficient evidence for the jury to conclude, beyond a reasonable doubt, that the defendant was the perpetrator of the instant offense.
This assignment is without merit.

Assignment of Error No. 2

In his second assignment of error, the defendant argues that the trial judge erred when he refused to grant a mistrial after the jury informed the trial judge that it was deadlocked after eight hours of deliberation.
The trial of the instant matter began on June 12, 1995. On June 13, 1995, the second day, the jury heard testimony from 8:30 a.m. until 6:30 p.m. when it retired to deliberate. At 9:00 p.m. that evening, the jurors informed the trial judge that they were tired. The trial judge ordered the jury to retire to their hotel rooms and return to court the next day at 8:30 a.m. to commence its deliberations. The jury resumed deliberations at 9:05 a.m. on June 14, 1995. At 2:45 p.m., the jury returned to the courtroom and informed the trial judge that they were deadlocked. One of the jurors stated that they could not agree with each other. The trial judge |7gave the jurors an additional charge and ordered the jury to resume its deliberations. The trial judge charged the jury:
This Court does not believe that any other jury can do any better job that what you can, ladies and gentlemen. And I’m hoping you will resume your deliberations with some fruitful — with a fruitful deliberative process
When you reenter the jury room, you should consult with one another, consider each other’s views and discuss the evidence with the objective of reaching a just and fair verdict as to all parties involved. Each of you must decide the case for yourself, however, but only after careful discussion and impartial consideration of the case with your fellow jurors. You’re not advocates. That means you are not an attorney. You’re not a spokesperson for one side or the other. Do not hesitate to reexamine your own views and to change your opinion if you’re convinced you’re wrong. But do not surrender your honest belief as to the weight and the affect of the evidence in this ease solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. In other words, we don’t want you to violate your conscience or your convictions. We do want you to engage in constructive deliberations with your fellow jurors if at all possible.
(Trial transcript, pp. 128-129).
The jury then deliberated from 3:50 p.m. to 4:30 p.m. when it returned with a verdict of guilty of second degree murder. Thus, the jury had deliberated for approximately eight hours when it informed the trial judge that it was deadlocked.
Although a mistrial may be ordered, and in a jury case the jury dismissed, when the jury is unable to agree upon a verdict, the length of time to be afforded a jury for deliberation is a matter within the discretion of the trial judge. La.C.Cr.P. article 775; State v. Simmons, *274 414 So.2d 705 (La.1982). The complexity and severity of the case is an important factor in the determination of what is a reasonable time. There is no requirement that a judge declare a mistrial at the initial sign of trouble. State v. Lowenfield, 495 So.2d 1245 (La.1985), cert. denied, Lowenfield v. Louisiana, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). A trial court’s decision whether to discharge a jury if it announces that it cannot agree upon a verdict will not be set aside without a showing of palpable abuse. Id.
In State v. Nicholson, 315 So.2d 639 (La.1975), the Supreme Court recognized the authority of a trial court to give further instructions to a jury unable to agree upon a verdict. However, the Court limited the instructions a trial court may give to a deadlocked jury. The Court held that if a trial judge gave an “Allen charge” or any “coercive modification” of an Allen charge, the trial court would have committed reversible error. The Allen charge originated in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the United States Supreme Court approved a charge to break a jury deadlock and accomplish jury unanimity. Characteristics of an Allen charge are (1) an admonition to the jurors in the minority to reconsider their opinion in favor of the majority in order to reach a decision and (2) the implication by the trial court to the jury that it must reach a decision because the trial court will not accept a mistrial. State v. Campbell, 606 So.2d 38 (La.App. 4th Cir.1992).
An instruction similar to the instruction used by the trial court in the present case was found not to be an Allen charge in State v. James, 96-472 (La.App. 3 Cir.1996), 687 So.2d 485, writ denied, 97-0069 (La.5/16/97), 693 So.2d 796. The trial court had instructed the jury that it should “not, however, surrender your individual opinions just to reach a verdict, but do consider the other juror’s (sic) views whether you’re in the minority or in the majority, consider the other’s views and weigh it against your own conclusions.” James, p. 4, 687 So.2d at 487.
This Court considered a modified Allen charge in State v. Campbell, supra. 19In Campbell, the trial court instructed the jury that
if a substantial majority of your number are in agreement as to a verdict which is proper in this matter, the other Jurors [sic] are seriously to ask themselves again and most thoughtfully whether they do not have a reason to doubt the correctness of a judgment which is not shared by several or most of their fellow jurors. And whether they should reconsider the weight and sufficiency of the evidence or whether or not they should consider their perception of the weight and sufficiency of the evidence or lack of evidence. Remember at all times that no juror is expected to yield a conscientious conviction that he or she may have as to the weight or effect of the evidence. But, remember also, after full deliberations and consideration of the evidence in this case, it is your duty to agree upon a verdict if you can do so with surrendering your conscientious conviction.
Campbell, 606 So.2d at 39-40.
This Court concluded the trial court committed reversible error when it charged the jury with this instruction. The charge clearly mandated the jurors in the minority to reconsider their views in light of the majority view. The charge given by the trial judge in Campbell is strikingly different from the charge given by the trial judge in the present case as the instruction given by the trial judge in the present case did not seek to have those in the minority reconsider their views.
In the case at bar, the jury deliberated for approximately eight hours when it informed the trial court that it was deadlocked. Given the seriousness of the charged offense and possible death sentence, the trial court did not abuse its discretion in seeking to have the jury con *275 tinue its deliberations. The trial court did not err when it refused the defendant’s motion for mistrial. Further, the trial .court’s additional charge to the jury was not an Allen charge. The trial court did not imply that it would not accept a mistrial or that the jurors in the minority should reconsider their views.
1 ipThis assignment is without merit.
For the foregoing reasons the defendant’s conviction and sentence are affirmed.

AFFIRMED.

. On January 8, 1999, the defendant notified this Court of his desire to file a pro se appellate brief and requested that a copy of the appellate record be forwarded to him. On March 17, 1999, this court forwarded a copy of the appellate record to the defendant and granted defendant time to file a pro se brief. On July 1, 1999, the defendant notified this Court that he was satisfied with the brief filed by appellate counsel and would not be filing a pro se brief.