Leslie **LOWENFIELD**, Prisoner No. DOC–106178

v.

C. Paul **PHELPS**, Secretary of the Department of Corrections, State of Louisiana, et al.

Civ. A. No. 86–5036.

United States District Court, E.D. Louisiana.

March 31, 1987.

Maurice N. Ross, New York City, Nancy Marshall, New Orleans, La., for petitioners.

William C. Credo, III, Asst. Dist. Atty., Gretna, La., for respondents.

## MEMORANDUM DECISION

BEER, District Judge.

This matter is before the Court on motion of Petitioner, Leslie Lowenfield, for a writ of habeas corpus and stay of execution, pursuant to 28 USC § 2254. Petitioner claims that he is being detained unlawfully by respondent, Frank Blackburn, in his official capacity as warden of the Louisiana State Penetentiary at Angola, Louisiana. This detention is pursuant to judgment of conviction and sentence of death imposed by the 24th Judicial District Court of Jefferson Parish, Louisiana. Petitioner claims that this conviction and sentence were in violation of rights, privileges, and immunities guaranteed by the Constitution of the United States. For the following reasons, Petitioner's request for relief must be DENIED.

## FACTS

The facts are set forth extensively by the Louisiana Supreme Court in *State v. Lowenfield*, 495 So.2d 1245 (La.1985). They are recounted here as they relate to the issues raised.

Petitioner met Sheila Thomas, the "primary" victim, in July of 1981. At the time, she was working in the sheriff's department in Jefferson Parish, where her principal duty was to escort prisoners from the parish jail to the courthouse and return them back to that facility. In August of 1981 Sheila and her young daughter, victim Shantell Osborne, moved in with Petitioner. The relationship deteriorated into one of acrimony, punctuated by periodic separations. This living arrangement was terminated in June of 1982.

Subsequent to this break up, relations between Petitioner and Sheila Thomas and her family became increasingly bitter. About 5:30 p.m. on 30 August 1982, Sheila Thomas' stepfather, Owen Griffin, was sitting in a vacant lot near his home in Marrero, Louisiana, playing cards with his neigh-

bors, when he heard shots ring out from the Griffin residence. He rushed to the house and ran inside, whereupon more shots rang out.

When the police arrived, they found five bodies sprawled about the living area of the house. Along with Sheila Thomas and her four year old daughter, Shantell, were the bodies of Carl Osborne, the father of Shantell, Owen Griffin, and his wife, Myrtle Griffin. All had sustained multiple gunshot wounds. Each had been shot in the head at close range.

A jury convicted Petitioner of three counts of first degree murder and two counts of manslaughter. Following the presentation of evidence during the sentencing phase of the trial, the jury unanimously recommended the death sentence. On 29 May 1984 Petitioner was sentenced to death on each count of first degree murder. The Louisiana Supreme Court affirmed the jury's findings and the sentence on 2 December 1985. The trial court signed Petitioner's death warrant on 3 September 1986, setting his execution for 19 November 1986. In the trial court proceedings, Petitioner filed a petition for post-conviction relief, habeas corpus, evidentiary hearing and stay of execution on 12 November 1986. The trial court denied Petitioner's petition on 14 November 1986. Petitioner filed the instant motion with this court on 17 November 1986, two days before the date of execution. He asserted sixteen claims for relief. This court stayed Petitioner's execution on 18 November 1986.

Following a conference with counsel for Petitioner and the State, this court granted Petitioner's request for an evidentiary hearing, setting it for 12 February 1987. At the evidentiary hearing, which included testimony from Petitioner at Angola, Petitioner was permitted to introduce evidence and testimony to support the contentions hereafter discussed.

### CLAIM 1 *Instruction of the Jury*

█] In his first claim for relief, Petitioner asserts that the aggravating circumstance that formed the basis for the death sentence, as applied in this case, violates the eighth and fourteenth amendments because the jury was improperly instructed.

Petitioner was sentenced to death by the jury on the basis of its finding two statutory aggravating circumstances: La.Code Crim.Proc.Ann. arts. 905.4(d) and 905.4(h). The Louisiana Supreme Court found that the evidence adduced at trial was insufficient to support the aggravating circumstance set forth in article 905.4(h). Thus, the aggravating circumstance upon which Petitioner's sentence stands is set forth in article 905.4(d): that Petitioner "knowingly created a risk of death or great bodily harm to more than one person."

At the sentencing phase of Petitioner's trial, the court instructed the jury that in order to find the existence of the aggravating circumstance set forth in La.Code Crim. Proc.Ann. art. 905.4(d), it was required to find that Petitioner knowingly created a risk of death or great bodily harm to more than one person. Petitioner claims that the court was obligated to instruct the jury that it had to find that Petitioner "acted with *specific intent* to kill more than one person and actually caused the death of one person and the risk of death or great bodily harm to at least one person, *all by a single act or by a series of acts in a single consecutive course of conduct.*" Petitioner's brief, at 20 (emphasis in original). For support of this assertion Petitioner cites *State v. Williams*, 480 So.2d 721, 726 (La. 1985). Because the jury was not instructed in accordance with the holding in *Williams*, Petitioner argues, the aggravating circumstance upon which he was sentenced could not provide the discretion-guiding function required by the United States Supreme Court. *See, e.g., Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

In *Williams*, decided subsequent to Petitioner's conviction and sentencing, the issue was whether the evidence was sufficient to prove both that (1) defendant acted with a "specific intent to kill ... more than one person" (one of the aggravating elements in La.Rev.Stat.Ann. § 14:30's definition of first degree murder that must be

proved in the guilt phase), and (2) that defendant "knowingly created a risk of death ... to more than one person" (the aggravating circumstance of article 905.-4(d) that must be proved in the penalty phase). The *Williams* court held that the two statutes should be construed similarly, even though one defines the crime and the other involves the standards for jury discretion in sentencing. Regarding article 905.4(d), the *Williams* court observed that

the Legislature intended to classify among the most serious murders those in which the murderer specifically intended to kill more than one person and actually caused the death of one person and the risk of death or great bodily harm to at least one other person, all by a single act or by a series of acts in a single consecutive course of conduct.

*Williams*, at 726.

The *Williams* court, however, did not deal with jury instructions. Its objective was to determine whether the evidence supported the jury's affirmative finding of an aggravating circumstance in both the guilt and penalty phases. In a factual setting less compelling than the instant one, the *Williams* court found that the evidence supported the jury's findings. The Louisiana Supreme Court had the same opportunity in the instant case and likewise determined that the evidence adduced at trial supports the jury's findings. This court finds no constitutional defect in that court's conducting of its appellate review.

CLAIM 2 *Duplication of the Elements of the Underlying Crime in the Aggravating Circumstances*

█ In his second claim for relief Petitioner asserts that the aggravating circumstance upon which the death sentence is based merely duplicates the elements of capital, or first degree, murder under Louisiana law. As such, Petitioner argues, the statutory aggravating circumstance in this case does not provide a rational basis for the imposition of the death penalty.

Petitioner was convicted of three counts of first degree murder and two counts of manslaughter. Under La.Rev.Stat.Ann. § 14:30 A.(3), first degree murder is the

killing of a human being "when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." The elements required to prove the existence of the sole aggravating circumstance upon which Petitioner's death sentence is based, La.Code Crim.Proc.Ann. art. 905.4(d), are, indeed, duplicative of the elements needed to prove the underlying crime of first degree murder. Petitioner argues that this violates constitutional requirements as set forth by the United States Supreme Court.

In 1972 the United States Supreme Court struck down as violative of the eighth and fourteenth amendments death sentences imposed under statutes that left juries with "untrammeled discretion" to impose or withhold the death penalty. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Four years later, in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *reh'g denied* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976), the Court ruled that Georgia's death penalty statute was constitutional. *Furman* and *Gregg* thus form the datum from which this Court's analysis must proceed.

After summarizing its former problems with affording juries untrammeled discretion, the *Gregg* court set forth a general exposition of sentencing procedures that would satisfy the concerns of *Furman*. Specifically, Georgia's statute set up a bifurcated process whereby after the jury first found that the defendant was guilty of murder, it would then pass upon the sentence to be imposed in a separate process. Georgia narrowed the class of murderers subject to capital punishment by specifying ten statutory aggravating circumstances, one of which must be found to exist after the guilt phase to impose a death sentence. Georgia defined murder as when a person "unlawfully and, with malice aforethought, ... causes the death of another human being...." Ga.Code Ann. § 26–1101 (1978). Thus, Georgia's statutory aggravating circumstances narrowed the class of persons eligible for the death penalty and reasonably justified the imposition of a more severe sentence on

some people than on others convicted of the same underlying crime. The unifying theme of all Supreme Court death penalty review is that to be valid, a state's death penalty must provide a reasonable distinction between those convicted murderers who warrant death and those convicted murderers who do not. What is important at the selection stage, the Court has reiterated often, "is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (emphasis in the original); *See also Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

Louisiana has a bifurcated process. Modeled after Georgia's statute, Louisiana's death scheme is different in that the *definition* of murder includes, or duplicates, the aggravating circumstances that are later used to distinguish between those convicted murderers who are to die and those who are to live. In 1979 the Louisiana Legislature amended La.Rev.Stat.Ann. § 14:30 to add the requirement of an "aggravating circumstance" as an essential element of first degree, or capital, murder. Thus, the State Legislature incorporated the discretion-channeling function of aggravating circumstances into the *definition* of first degree murder, thereby requiring the finding of an aggravating element in the guilt phase of the trial, before the offender could even be subject to a penalty hearing. It is this aspect of Louisiana's death penalty statute that Petitioner attacks as violative of the mandate of *Furman, Gregg,* and cases that follow.

The Louisiana Supreme Court has held repeatedly that this statute is constitutionally valid. *See, e.g., State v. Loyd,* 489 So.2d 898 (La.1986); *State v. Knighton,* 436 So.2d 1141 (La.1983); *State v. Clark,* 387 So.2d 1124 (La.1980). *See also Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.1986); *Gray v. Lucas,* 677 F.2d 1086, 1104 (5th Cir.1982). Petitioner, however, cites to *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), *cert. denied,* 474 U.S. 546, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985) for support. In *Collins,* petitioner Carl Collins

was convicted in Arkansas for felony murder, specifically charged in the bill of information as murder in the course of a robbery. In Arkansas at that time not all murder was capital murder, however. To obtain a capital murder conviction, the state needed to show the existence of at least one of six statutorily defined aggravating circumstances, one of which was felony murder. As in Louisiana, a finding of felony murder was not itself sufficient to warrant the death penalty. The jury had also to find at least one statutory aggravating circumstance, which, in Collins' case, was that the murder was committed for pecuniary gain.

The Eighth Circuit noted first that the aggravating circumstance used to sentence Collins was the same element that the state used to convict defendant of capital murder in the first place. "Thus, once Collins had been convicted for capital felony murder ..., the jury had necessarily found one aggravating circumstance." *Collins,* at 263. Drawing from *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the *Collins* court stated that "an aggravating circumstance is an objective criterion that can be used to distinguish a particular defendant on whom the jury has decided to impose the death sentence from other defendants who have committed the same underlying capital crime." *Collins,* at 264. The Eighth Circuit concluded that there is "no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform this narrowing function [required by *Furman, Gregg, Godfrey,* and *Zant* ]." *Id.* Thus, argues Petitioner, in Louisiana, if no aggravating or mitigating circumstances are found in the sentencing phase, other than those already found in the guilt phase, the jury is left to decide whether to impose death on a murderer, who also acted with a specific intent to kill or inflict great bodily harm upon more than one person, without having made any finding that

narrows the class of those who have committed the same death-eligible crime. *See also Wiley v. Mississippi*, — U.S. —, 107 S.Ct. 304, 305, 93 L.Ed.2d 278 (1986) (Marshall, Brennan, JJ., dissenting) ("[T]he use of aggravating circumstances which repeat an element of the underlying capital offense creates a substantial risk that death will be inflicted in an arbitrary and capricious manner.").

The United States Supreme Court has interpreted the eighth and fourteenth amendments as requiring the states to provide statutory aggravating circumstances as discretion-guiding aids to juries. *Zant v. Stephens*, 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). The rationale underlying this is that such aggravating circumstances provide a "meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). The Supreme Court has not held, and this court does not interpret the U.S. Constitution to require, that the aggravating circumstance(s) used to sentence a defendant must be different from the element(s) of the underlying crime.

The *Collins* argument is flawed in practice. This argument requires the state to introduce something "extra" at the sentencing phase: an aggravating circumstance to narrow the class of death-eligible criminals. To allow the state to merely reintroduce at the sentencing phase that which was determined at the guilt phase, this argument suggests, is to make the sentencing phase but a sham. However, the reality of the situation is that the jury has, necessarily, already found the existence of the aggravating circumstance(s) by the time of the sentencing phase. Moreover, the *Collins* approach uses the sentencing phase to narrow the class of death-eligible offenders; Louisiana narrows the class at the definitional stage. The death-eligible class of murderers, having been narrowed from the larger pool of murderers, then goes before the jury for its decision in both systems. What is important at this stage is that the jury, with all the

information available, has the same latitude of discretion that is constitutionally mandated. In actuality, the end result is identical in either system although slightly different—albeit equally valid—routes are used in arriving there.

CLAIM 3 *The Death Penalty as Discriminatorily Applied*

Petitioner argues that Louisiana's death penalty, as applied, discriminates against black defendants in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. Petitioner, a black person, contends that Louisiana's capital punishment statute is discriminatorily applied on the basis of both the race of the defendant and the race of the victim. Therefore, claims Petitioner, his petition presents the identical issue on which the U.S. Supreme Court granted certiorari in *McCleskey v. Kemp, cert. granted*, — U.S. —, 106 S.Ct. 3331, 92 L.Ed.2d 737 (1986) and *Hitchcock v. Wainwright, cert. granted*, — U.S. —, 106 S.Ct. 2888, 90 L.Ed.2d 976 (1986).

This court granted Petitioner's request for an evidentiary hearing. The hearing was held on 12 February 1987 at which time Petitioner introduced testimony from Dr. Mervyn D. Smith, a Ph.D. in sociology. Dr. Smith had considerable expertise in the area of racial discrimination in the area of sentencing. However, having heard Petitioner's evidence on this claim, the court is obliged to conclude that the argument is without merit.

Petitioner further argues that because this case is similar to two cases presently before the Supreme Court, it should be stayed pending the Court's resolution of the issues. Petitioner did not, in any meaningful way, establish at the evidentiary hearing or otherwise that the instant case is controlled by the same issues that are present before the Supreme Court in *McCleskey* and *Hitchcock*. Petitioner did not produce evidence that even remotely established specific acts evidencing intentional or purposeful discrimination against him on the basis of race. *Berry v. Phelps*, 795 F.2d 504 (5th Cir.1986); *Prejean v.*

*Maggio,* 765 F.2d 482, 484 (5th Cir.1984); *Spinkellink v. Wainwright,* 578 F.2d 582, 614 (5th Cir.1978). Stated succinctly, Petitioner failed to satisfy his burden of proof that he was discriminated against. Finally, this court is obliged to deal with cases and controversies according to existing jurisprudence; until that jurisprudence changes, this Court must be unaffected by the fact that it may, some day, change.

CLAIM 4 *The Introduction At Trial of Arbitrary Factors*

In this claim, Petitioner argues that arbitrary factors were introduced at the sentencing phase of his trial in violation of his right to due process under the fourteenth amendment. Petitioner cites four arbitrary factors.

First was the admission of a bill of information charging Petitioner with making harassing phone calls to the primary victim, Sheila Thomas, before her death. This bill was introduced to support the State's assertion of La.Code Crim.Proc.Ann. art. 905.4(h) ("the victim was a witness in a prosecution against the defendant") as an additional aggravating circumstance. The Louisiana Supreme Court held that the evidence was insufficient to prove that Petitioner killed Ms. Thomas to keep her from testifying against him, because Petitioner was only charged with this crime after the murders had occurred. Although the Louisiana Supreme Court ruled that the evidence was insufficient, it found that "given the overwhelming enormity of defendant's crime, it is inconceivable that the additional evidence that the defendant was charged with could have prejudiced defendant." *State v. Lowenfield,* 495 So.2d 1245, 1258 (La.1985). Petitioner takes issue with this. He argues that, far from being inconceivable, it was substantially likely that this flawed evidence could have tipped the balance in the minds of one or more jurors in favor of the death penalty, especially in light of the circumstantial posture of the case.

■■] The federal judiciary's resistence to challenges in federal court of state court evidentiary matters by habeas corpus is firmly established. *See, e.g., Bryson v.*

*State of Alabama,* 634 F.2d 862, 864 (5th Cir.1981). A violation of state evidentiary rules will not, in and of itself, invoke section 2254 habeas corpus relief. *Id.* The violation must be of such a magnitude that it constitutes a denial of fundamental fairness. *Meyer v. Estelle,* 621 F.2d 769, 771 (5th Cir.1980); *Cronnon v. Alabama,* 587 F.2d 246, 250 (5th Cir.1979). The erroneous admission of prejudicial evidence can justify habeas corpus relief only if the error was "material in the sense of a crucial, critical, highly significant factor." *Hills v. Henderson,* 529 F.2d 397, 401 (5th Cir. 1976). In the instant case Petitioner was convicted of murdering five people, including a four year old girl. Each victim had been shot in the head at close range. The introduction of evidence pertaining to petitioner's making harassing telephone calls does not rise to the level of a denial of fundamental fairness.

Petitioner's second claim is that the jury was improperly charged, as set forth more fully in Claim 1. This claim has, therefore, been dealt with in detail, *supra.*

■■ Petitioner's third claim is that the trial court allowed evidence of a prior criminal conviction in a foreign court without first requiring proof of the reliability and fairness of the foreign proceeding. Specifically, Petitioner was convicted of attempted rape and a weapons charge in Canada.

In *Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), the Court recognized that under the sixth amendment an uncounseled felony conviction cannot be used for certain purposes. However, the Court noted this does not mean that such a conviction cannot be used for other purposes. *Lewis* dealt with the State's use of an uncounseled felony conviction for the purpose of imposing a "civil firearms liability, enforceable by a criminal sanction." 445 U.S. at 67, 100 S.Ct. at 921. The Court distinguished *Lewis* from past cases in which the use of an uncounseled felony conviction was held invalid. In those cases, the Court stated, the subsequent conviction or sentence violated the sixth amendment because it depended upon the reliability of the past uncounseled con-

viction. However, the Court observed, federal gun laws focus not on reliability, but on the mere fact of conviction, or even indictment, in order to keep firearms away from potentially dangerous persons. Thus, the Court held, "enforcement of that essentially civil disability though a criminal sanction does not 'support guilt or enhance punishment.'" *Id.*

In *State v. Mattheson*, 407 So.2d 1150, 1164 (La.1982), the defendant objected to the introduction at the sentencing phase of prior convictions without a showing that he had been represented by counsel. Citing *Lewis*, the *Mattheson* court stated that the convictions "were not used to enhance punishment; rather, defendant's past criminal history was merely a part of the total picture of his 'character and propensities.'" *Id.* On appeal of the denial of Mattheson's habeas petition, the Fifth Circuit noted that it is clear that a habeas petitioner has the burden of proving that the convictions used by the state were constitutionally defective. *Mattheson v. Maggio*, 714 F.2d 362, 365 (5th Cir.1983). *See also Webster v. Estelle*, 505 F.2d 926, 928–29 (5th Cir.1974), *cert. denied*, 421 U.S. 918, 95 S.Ct. 1581, 43 L.Ed.2d 785 (1975).

In the instant case, there is nothing in the record to show that Petitioner's prior criminal record was introduced for any reason other than to illustrate a part of the total picture of his character and propensities. Petitioner has the burden of showing at least some constitutional deficiency in the prior convictions introduced at the sentencing phase. This he has not done.

■ In his fourth claim, Petitioner asserts that the trial judge coerced a seemingly deadlocked jury into sentencing Mr. Lowenfield to death.

The jury was charged in the afternoon of 15 May 1984. It deliberated over three hours that night. The next day the jury deliberated for another two hours when defense counsel moved for a mistrial. Several hours later defense counsel re-urged his motion. The jury was brought back into the courtroom when it indicated that it was deadlocked. The court again charged the jury, telling them that if they were unable to reach a verdict, the court would sentence petitioner to life imprisonment. In response to the court's poll, four jurors indicated that further deliberations would not be helpful. The trial judge conferred with counsel, brought the jury back into court, and asked them: "Do you feel that any further deliberations will enable you to arrive at a verdict?" The result of the second polling was that one juror was of the view that further deliberations would not be helpful. The court sent them back to deliberate. Thirty minutes later the jury came back with its verdict. Petitioner claims that by ordering the jury to continue its deliberations despite a "clear indication that the jury was hopelessly hung, the court in effect coerced the jury to quash any dissent and to return a verdict of death." Pet. Br., at 43.

In Louisiana it is the trial judge who determines when a jury is deadlocked. *State v. Monroe*, 397 So.2d 1258, 1272 (La. 1981). His decision is not to be overturned except upon a showing of "palpable abuse of discretion." *State v. Governor*, 331 So.2d 443, 451 (La.1976). Unlike the trial judge in *Jones v. Norvell*, 472 F.2d 1185 (6th Cir.1973), which Petitioner cites for support, the judge in Petitioner's case did not invade the secrecy of the jury or identify a deadlocked jury's majority-minority count. Considered in light of the totality of the circumstances, the trial judge's decision to return the jury for further deliberations did not constitute a violation of Petitioner's constitutional rights.

CLAIM 5 *Change of Venue*

Petitioner argues that the trial court erred in not granting his motion for a change in venue. Petitioner claims that a change of venue should have been granted because of the "close working relationship" between the judges involved in the case and the primary victim, Sheila Thomas. Moreover, Petitioner claims that the trial court conducted a voir dire on Petitioner's motion for a change of venue that was inadequate to determine the actual prejudice resulting from the pretrial publicity. According to Petitioner, the court should

have presumed actual prejudice from the pretrial publicity.

Petitioner first claims that the judges were unable to adequately distance themselves from Sheila Thomas and her family. Judge Collins testified at this court's evidentiary hearing that he had had contact with the Thomas family going back many years. He recused himself, and the case was re-alloted to Judge Cannella. Petitioner then claims that because Judges Collins and Cannella are part of the same judicial "team", and because Judge Cannella also knew Sheila Thomas, Judge Cannella could not impartially try Petitioner's case. At the evidentiary hearing Judge Cannella testified about the use and make up of the judicial teams; that they are, primarily, loose organizational structures designed to ensure that at least one judge will always be available at the courthouse. Judge Cannella testified that he has no more contact with members of his judicial team than with other, nonmember, judges, and that he would be no more likely to confer with members than non-members concerning any given case or issue. More to the point, Judge Cannella testified that he did not know Sheila Thomas or her family, and became aware that she had, apparently, escorted prisoners to his courtroom only after the trial proceedings in this case had begun. Lastly, both Judges Cannella and Collins testified that they had, in fact, *not* discussed the Lowenfield case at all. I find their testimony credible in all respects.

Petitioner claims that extensive pre-trial publicity permeated the local community to such an extent that he could not receive a fair trial. The trial court conducted two hearings on Petitioner's motions for a change in venue. The first hearing was held in April, 1983, eight months after the murders and over a year prior to trial. At this hearing Judge Collins heard twenty prospective jurors questioned about their knowledge of the publicity. Of the twenty, one was disqualified for a hearing impairment, three had heard reports of the case and had formed opinions, three had neither heard nor read of the case, one knew Petitioner, and the remainder of the people had heard of the deaths but had not formed an opinion. After hearing the testimony Judge Collins denied the motion. The second hearing was held in May, 1984, just prior to the trial. Twenty-nine people were called and asked whether they had heard of the case. Ten responded affirmatively and the rest stated that they hadn't heard of the case. Of the ten, only two said they couldn't determine what effect the publicity would have on them, and only one had formed an opinion. Judge Cannella denied the motion.

Four of the jurors and alternate jurors actually selected to hear the case had heard about the series of events prior to trial. One of the accepted jurors stated that he questioned his ability to sit through the trial and be fair and unbiased. Another stated that he had a problem with the presumption of innocence, while another stated that she couldn't be sure that she could fairly serve on the jury if Petitioner failed to take the stand. Petitioner claims that the court's determination that an impartial jury could be chosen was highly questionable and, in fact, the jury actually chosen was not impartial and had been unduly prejudiced by pre-trial publicity.

Petitioner relies upon *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) for the proposition that habeas relief is mandated where the trial court failed to give the defendant a full and fair opportunity to prove prejudice from pretrial publicity. The Court in *Dowd* pointed out that

it is not required that jurors be totally ignorant of the facts and issues involved.... [A]n important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression

or opinion and render a verdict based on the evidence presented in court. *Id.*, 81 S.Ct. at 1642–43. The Court went on to say that the test is whether the nature and strength of that opinion suffice to rebut the presumption of a juror's impartiality as a matter of law. The question thus presented is one of mixed law and fact. The *Dowd* Court held that "the affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside." *Id.*

█ Petitioner claims that the trial court at both hearings relied erroneously upon the statements made by the jurors themselves about their individual competence to impartially hear the case. He argues that the court should have made a more detailed and individualized questioning of the veniremen. Petitioner cites to *United States v. Davis*, 583 F.2d 190 (5th Cir.1978) for support. In *Davis*, a case that attracted national coverage, every jury panel member had heard about the case. The trial judge asked whether any panel member felt that the publicity impaired his ability to render an impartial decision. No juror responded. The court denied defendant's request for individualized voir dire. The Fifth Circuit Court of Appeals held that "[t]he district court erred in not undertaking a more thorough examination of those panel members exposed to publicity." *Id.* The *Davis* court recognized that where pretrial publicity is a factor, a juror's conclusory statement of impartiality is insufficient. Instead, the trial court, and not the juror, must determine, from questioning, whether the juror can lay aside any impression or opinion due to the exposure. However, this court has before it a habeas corpus review; a review of state proceedings. *Davis* dealt with appellate review of a federal district court criminal trial. The Fifth Circuit reversed the district court in *Davis* "in the exercise of its supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts, and not as a matter of constitutional compulsion." *Murphy v. Florida*,

421 U.S. 794, 797, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975) (citing *Marshall v. United States*, 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959)). Further, in this case the lawyers for both sides interviewed each prospective juror individually and often at great length. The voir dire transcripts occupy several hundred pages. Even if the judge were to have asked questions of each potential juror, there would have been little he could have asked that the attorneys did not. Petitioner has failed to show that there was such pre-trial prejudice to warrant a change in venue.

Regarding the imperfections of the jurors' actually chosen, this court read those applicable portions of the transcripts. Four of the jurors had heard about the case on the news. As discussed above, this, alone, means little, and Petitioner takes it no further. One of the jurors questioned his ability to sit through the whole trial and be fair-minded. However, this statement was made in the context of concern for his wife and new baby; he was worried about leaving them alone. His concern did not relate to this case as such, and once his concerns over his family were addressed, he agreed that he held no preconceptions. He was not challenged. However, one juror, Catherine Roberts, expressed an inability to not consider Petitioner's not taking the stand:

> MS. ROBERTS: ... I know right now the idea of his not being up there, I know if I'm thinking now I'm sure it might happen.
>
> MR. CAPITELLI: ... I need to know the answer now. I'm not going to get a chance to do it later. If it is causing you concern now, I need to ask you to articulate it in terms of would that effect in your mind concern you to the point you could not be totally fair?
>
> MS. ROBERTS: Yes.

Transcript, 9 May 1984, at 168. Ms. Roberts was asked a few more unrelated questions. She was not challenged. Petitioner apparently felt that she was a good juror for his cause. It may have been the way she looked, her religious affiliation (Luter-

an (sic)), or something else. In any event, Petitioner was satisfied with her. Further, Petitioner *did* take the stand, so Ms. Roberts's reservations were mooted.

■ Petitioner contends that the trial court should have *presumed* prejudice to Petitioner based upon the pre-trial publicity. He claims that the pre-trial publicity in this case so pervaded and saturated the community that a fair trial was impossible. In support of the contention that, in this instance, the court should have presumed prejudice, Petitioner cites: *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Mayola v. Alabama,* 623 F.2d 992 (5th Cir.1980); *Shepard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Each of those cases is distinguishable. Prejudice was presumed in the circumstances under which the trials in *Rideau, Estes,* and *Shepard* were held. In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings. In *Rideau* the defendant "confessed" under police interrogation to the murder for which he was later convicted. A twenty minute film of this confession was broadcast three times by a television station in the community where the crime and trial took place. In reversing, the Court did not examine the jury voir dire for evidence of actual prejudice because it considered the trial "but a hollow formality," the real trial having occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

In *Mayola,* the defendant, accused of the rape-murder of a young boy, turned himself in to authorities in a foreign state. A reporter from the town in which the trial was to take place finagled his way into the car that was used to transport the defendant. News reports of what the defendant was saying appeared as headline news each day. These stories were inculpatory and played upon the emotions of the population of a small town. Nevertheless, although these stories seemed prejudicial and, in some instances, erroneous, the court held that defendant did not meet his burden of showing the requisite pervasiveness of prejudice to warrant the court's presumption of prejudice. The trials in *Estes* and *Shepard* were overturned and prejudice presumed because the proceedings were not only infected by a background of inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. In the instant case Petitioner has shown neither the requisite degree or pervasiveness of prejudicial publicity nor the requisite lack of decorum in the proceedings to warrant a presumption of prejudice.

CLAIM 6

Petitioner combines various issues in support of granting his writ of habeas corpus. To clarify the arguments raised within Claim 6, the Court will review the legal issues point by point, as addressed in the original petition.

A. *The Constitutionality of La.Rev.Stat. Ann. § 15:432*

■ Petitioner first asserts that La. Rev.Stat.Ann. § 15:432 violates the due process clause of the fourteenth amendment in that the statute impermissably shifted the burden to the Petitioner to prove his competency to stand trial. Pet. Brief at 74. Petitioner avers that once the competency of a defendant is at issue, the burden should fall upon the prosecution to prove the defendant's fitness for trial. *See, United States ex rel. v. Franzen,* 686 F.2d 1238, 1244–45 (7th Cir.1982); *United States v. Makris,* 535 F.2d 899, 906 (5th Cir.1976); *but see Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (Rehnquist, J., concurring); *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed.2d 1302 (1952). In *Franzen,* the Seventh Circuit Court of Appeals ruled that there was "little question that the Fourteenth Amendment requires the State or federal prosecution to shoulder the burden of proving that the defendant is fit to stand trial once the issue of unfitness has been properly raised." 686 F.2d at 1244. This reasoning echoed sentiments expressed in a

more limited context by the Fifth Circuit in *Makris.*

The reasoned pronouncements of the Fifth and Seventh Circuits with regard to the burden of proving a defendant's fitness to stand trial are unavailing to Petitioner, who voluntarily withdrew his insanity plea and opted for an alibi defense. Petitioner was accorded three sanity hearings. The conclusion reached by all three commissions was that Petitioner was sane. Following the third sanity hearing, Petitioner took the stand of his own volition and voluntarily withdrew his insanity defense, testifying:

> ... I plead not guilty and my reason for pleading not guilty because I wasn't in the State of Louisiana in August—August 30, 1982 the day I was accused of a crime.
>
> ... I wished not to plead guilty by reason of insanity because reason of insanity is telling the court that this person did something he wasn't responsible for something. And to the best of my knowledge I never had no mental illness in my whole entire life and up to this moment I do not have any mental problems. And I advised him to withdraw the plea because it's telling, you're telling the court plainly to plead reasonable insanity. You're looking for a way out.... (Trial Trans. Vol. III, at 851–852).

Petitioner voluntarily determined to pursue an alibi defense. At that point, he put to rest the question of his fitness to stand trial.[1] The withdrawal of the insanity defense essentially mooted the issue of whether the three previous sanity hearings passed constitutional muster.

Petitioner's reliance on *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) is misplaced. In *Sandstrom,* the Supreme Court reversed a criminal conviction when the trial court improperly instructed the jury by not requiring the state to prove every element of the *substantive crime* beyond a reasonable

doubt. In contrast, the jury in the instant case found that the State proved every element of the substantive crime beyond a reasonable doubt. The rule *Sandstrom* simply compels the state to prove guilt beyond a reasonable doubt concerning all the elements of the substantive crime. Moreover, as already noted, the issue is mooted by the Petitioner's withdrawal of his insanity plea for the reasons stated above.

### B. The Right to be Provided with Psychiatric Assistance to Prepare a Defense Under the Sixth and Fourteenth Amendments

■ In this portion of his sixth claim, Petitioner contends that he was "never assigned a psychiatrist to assist him in preparing" for his defense at the original trial or at any of his subsequent appeals. Pet.Br. at 75. Petitioner contends that the denial of psychiatric assistance was in violation of the Supreme Court's holding in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

In *Ake,* an indigent defendant had received extensive pre-trial psychiatric evaluation. When the defendant's condition rehabilitated to the point where criminal proceedings could continue, the defendant's attorney informed the Court that the defendant would raise the insanity defense. Defense counsel then requested that the State provide a psychiatrist to examine the defendant concerning his "mental condition at the time of the offense." 105 S.Ct. at 1091. The trial court refused the request. On review, the Supreme Court reversed the trial court's denial of psychiatric assistance and stated:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evalua-

---

1. It is clear that Petitioner refused to allow his counsel to present an insanity defense. Evid.

Hear. at 102.

tion, preparation, and presentation of the defense.

*Id.* at 1097.

Any valid claims that the present Petitioner may have invoked under the *Ake* decision became moot when the Petitioner voluntarily withdrew his insanity defense. Here Petitioner "demonstrated to the trial judge" his desire to procede with an alibi defense and not an insanity defense. Thus, the "significant factor at trial" was whether the Petitioner was in Louisiana on the day of the crime and not whether he needed psychiatric assistance for a defense that he chose not to pursue.

### C. The Trial Court's Compliance with the United States Supreme Court's Pronouncement in Pate v. Robinson

Petitioner next avers that following his third sanity hearing on May 7, 1984, various events took place that should have prompted the trial court to order further psychiatric testing and competency proceedings of the Petitioner. The purported events included, *inter alia,* Petitioner's request that his counsel withdraw his insanity plea, his instructions to counsel not to present an insanity defense, and counsel's motion to withdraw from representing Petitioner. *See generally,* Pet. Br. at 76–79. These and other factors now lead Petitioner to assert rights pursuant to the decision in *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

*Pate* is another case in a line of decisions in which the Supreme Court has attempted to outline the rights owed under the Federal Constitution to a criminal defendant whose sanity or general competency to stand trial is questioned. In *Pate,* the Court held that the defendant had not waived the issue of whether he was competent to stand trial due to his possible insanity. *Id.* at 384, 86 S.Ct. at 841. Under those circumstances, the Supreme Court ruled that the Petitioner's "constitutional rights were abridged by his failure to receive an adequate hearing on his competence to stand trial ..." *Id.* at 386, 86 S.Ct. at 842.

In the case at bar, Petitioner was accorded three sanity hearings that delved into whether he was fit to stand trial. All three of the commissions answered in the affirmative. The trial court fulfilled the mandate of *Pate.* Furthermore, Petitioner had no standing with respect to the *Pate* decision. The trial court had no obligation to order, *sua sponte,* a fourth sanity hearing simply because, following the third such hearing, Petitioner voluntarily waived his insanity defense and adopted an alibi defense.

### D. The Denial of Counsel's Motion to Withdraw and Petitioner's Motion to Replace His Counsel.

Petitioner's final contentions under Claim 6 concern his representation at trial. Invoking *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and cases following, he claims that the trial court erred in denying both his attorneys' motion to withdraw from the case and Petitioner's motion to substitute counsel.

In *Strickland,* the Supreme Court established two basic requirements for finding that a defendant has suffered ineffective assistance of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

104 S.Ct. at 2064.

To support the claim that his counsel was ineffective, Petitioner cites to various activities that may suggest discord between him and his attorneys. A vast majority, if not all, of the purported events relate to alleged disagreements in strategy and potential conflicts between client and counsel. *See, e.g.,* Pet.Br. at 80–84. In reviewing a similar claim in Petitioner's state court proceedings, the Louisiana Supreme Court properly noted that in *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the determina-

tion of whether an attorney rendered effective assistance of counsel must concentrate "on the adveserial process, not on the accused's relationship with his lawyer as such." 104 S.Ct. 2046 at n. 21. Despite potential pre-trial disagreements between Petitioner and counsel, the record does not suggest that the adverserial "process los[t] its character as a confrontation between adversaries" that signals the breech of the "constitutional guarantee." 104 S.Ct. at 2045, 2046. Petitioner was accorded effective assistance of counsel in accordance with his sixth amendment rights.

■ Petitioner next points to the decision *Wilson v. Mintzes*, 761 F.2d 275 (6th Cir.1985) and asserts that the state court should have granted his motion to substitute counsel. Petitioner maintains that the presence of threatening letters and the disagreements between him and his counsel relating to the proper avenue of defense support his claim that his motion to substitute counsel should have been granted. Pet.Br. at 81–84. The facts and circumstances present here indicate that the trial court properly denied the motion to substitute counsel. Every criminal case has the potential for disagreement between the accused and counsel about strategies. What is pertinent to this case is that the court's denial of the motion was correct. Mr. Walker had been representing Petitioner since early 1983. *See* Trial Trans. Vol. I, at 47. The motion to substitute was heard on March 14, 1984. Trial Trans. Vol. III, at 597–599. By then, Mr. Walker was intimately involved with the case. Moreover, the true basis of Petitioner's fear (which led to the motion to substitute counsel) was unfounded—as discussed by the Louisiana Court of Appeals in *State v. Lowenfield*, 450 So.2d 675, 676 (La.App. 5th Cir.1984).

Although the pre-trial period did not proceed in complete harmony, there has been no showing that the trial court's denial of the motion to substitute counsel or counsel's motion to withdraw was "unreasonable and arbitrary." *Mintzes*, 761 F.2d 287.

Petitioner's sixth claim is without merit.[2]

CLAIM 7 *The Adequacy of the State Record*

In his seventh claim, Petitioner contends that the record is inadequate to determine whether the death sentence was arbitrarily imposed. Petitioner first claims that the transcript did not contain an adequate record of the voir dire proceedings. Therefore, it is contended that the record is inadequate for review on the issue of whether peremptory challenges were used to remove potential jurors on account of their race, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In a similar vein, Petitioner avers that the record does not indicate whether potential jurors were excluded due to their opposition to capital punishment. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); Pet.Br. at 85.

Petitioner cannot, on the showing made, contest the adequacy of this nine volume record, especially when there was no contemporaneous objection to the alleged error(s). *See* La.Code Crim.Proc.Ann. art. 841; *Engle v. Issac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). In *Batson*, defense counsel made a motion objecting to the use of the challenges. 106 S.Ct. at 1715. Similarly, in *Witherspoon*, the pertinent statements of the trial court were of

---

**2.** Intertwined in Claim 6 of the petition, the Petitioner contends that "The Louisiana Courts ... improperly determined that Mr. Lowenfield was competent to stand trial ..." Pet.Br. at 67. Unlike the other assertions raised under Claim 6, Petitioner fails to specifically elucidate the error of the Louisiana courts as he has done in arguments A through D. However, whether by impliedly attacking the Louisiana courts' findings as to his competency via individual arguments A through D, or, taken as a whole, all the facts and arguments raised in Claim 6, the Court finds Petitioner's assertion, that the Louisiana courts improperly found him competent to stand trial, is without merit. Petitioner was accorded three sanity hearings. He was found competent by all three commissions. For further elucidation on Petitioner's fitness to stand trial, see the discussion in *State v. Lowenfield*, 495 So.2d 1245, 1252 (La.1985). Moreover, Petitioner made the sanity and/or competency issue moot by withdrawing his insanity defense and opting for an alibi defense. Petitioner was competent to stand trial.

record. 391 U.S. at 514, 515, 88 S.Ct. at 1773.

Petitioner's final argument raised under Claim 7 contests the adequacy of the record as to various issues involving pre-trial hearings and other rulings made during the course of the case. Pet.Br. at 86–87. The proceedings in the present case are memorialized in a detailed nine volume record. Limited issues, aspects, and rulings to which Petitioner did not contemporaneously object cannot now be raised here. La.Code Crim.Proc.Ann. art. 841; *Engle.*

The various arguments raised in Petitioner's seventh claim are without merit.

CLAIM 8 *The Trial Court's Jury Instructions Concerning the Use of Circumstantial Evidence at the Guilt Phase of the Trial*

Petitioner's eighth claim questions the validity of the trial court's jury instruction concerning criminal convictions based on circumstantial evidence. Petitioner contends that pursuant to La.Rev.Stat.Ann. § 15:438, the trial court should have made it clear to the jury that a conviction based on circumstantial evidence must "exclude every reasonable hypothesis of innocence." Petitioner concedes that the desired charge was eventually given; however, he asserts that intervening instructions confused the jury. Pet.Br. at 89–90.

The State contends that no objection was lodged at trial and that Petitioner is barred from raising the issue before this Court. However, regardless of the State's contentions, Petitioner's arguments stressed in Claim 8 are without merit. The trial court instructed the jury that guilt had to be found beyond a reasonable doubt. The court also gave the charge implicit in La. Rev.Stat.Ann. § 15:438. Moreover, review of the record indicates that the charges, taken in their entirety, were not confusing. Petitioner's eighth claim is without merit.

CLAIM 9 *Petitioner's Right to Effective Assistance of Counsel*

Petitioner's ninth claim raises various factual and legal issues concerning whether he was afforded effective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674

(1984). Petitioner raises six scenarios that purportedly support the claim that his counsel was ineffective.

█ 1. Petitioner first argues that counsel's failure to move to suppress or otherwise object to the proffering of the murder weapons was both negligent and prejudicial to the Petitioner. Pet.Br. at 95. The Court is not persuaded by this initial contention. The decision to object to the admission of evidence or contest the validity of searches and seizures are decisions made by counsel based on counsel's trial strategy. So long as the specific decision does not extend beyond the "wide latitude" of practices allowed in the representation of a criminal defendant, *Strickland,* 104 S.Ct. at 2065, this Court should not interfere with counsel's decision.

As testified to by Mr. Capitelli at the evidentiary hearing held on 12 February 1987, counsel for Petitioner did not object to the proffer of the murder weapons because of his trial strategy. Evid.Hear. at 108, 109. Mr. Capitelli believed that the circumstances surrounding the handling of the murder weapons was a weak part of the State's case. It was his strategy not to raise an objection to the introduction of that evidence but to later argue that the linking of the weapons was one of the weaknesses of the State's case. Evid. Hear. at 108, 109. Thus, the decision was made not to object to the introduction of the weapons. Petitioner's arguments raised under the first scenario are without merit.

2. Petitioner next argues that counsel did not adequately prepare for the sanity hearings. Pet.Br. at 101. However, Petitioner's counsel did attempt to prepare Petitioner for the sanity hearings. Evid. Hear. at 101, 102. Petitioner refused to cooperate in this preparation. *Id.* This attitude reflects Petitioner's general opposition to putting forth the insanity defense. Trial Trans. Vol. III, at 851–852.

Related to the issue of the insanity defense, Petitioner also argues that counsel was negligent and caused him "actual prejudice" by not raising the insanity defense

(apparently at trial). *See* Pet.Br. at 101–103. Petitioner's argument is that despite the results of three sanity hearings and Petitioner's own insistance upon the withdrawal of his insanity defense, counsel should have girded their loins and proceeded with the insanity defense at trial irrespective of their client's expressed demand that they proceed with the alibi defense. Pet.Br. at par. 220, at 102, 103. This would have caused complete chaos at trial: on one side of the defense table, counsel would have been arguing an insanity defense, while on the other side of the table Petitioner would be seeking to take the stand in support of his alibi defense. At best, this procedure would have been unacceptable; at worst, it would have been a mockery.

Once petitioner opted for the alibi defense, counsel properly defended him on that basis and did not proceed further with the insanity defense. Each of the issues raised in the second scenario, including the related contentions raised in Pet.Br. at 101–105, are without merit.

3. The third group of facts centers on whether Petitioner was rendered ineffective assistance of counsel due to counsel's alleged failure to "insist upon a proper record." Pet.Br. at 105. Petitioner fails to cite to any authority to substantiate his position. However, the Court finds the nine volume transcript was adequate and preserved the record for reviewing the objections that were properly and timely made by Petitioner.

4. The fourth scenario presented by Petitioner concerns counsel's failure to object to certain jury charges given by the trial court. First, petitioner contends that counsel erred by not objecting to the trial court's instruction relating to aggravating circumstances under La.Code Cr.Proc.Ann. art. § 905.4(d). Since it has already been determined that this jury charge was proper, *see* Claim 1, *supra* at 426, 427, it follows that counsel's failure to object to the proper instruction could not be in error.

Petitioner also contends that counsel erred by not objecting to jury charges relating to the circumstantial evidence. Pet.Br. at 106–107. Since it has already been determined that the circumstantial evidence instruction was not confusing, *see* Claim 8, *supra* at 438, 439, counsel's failure to object to a properly given instruction was not in error.

5. Petitioner's fifth argument raised within Claim 9 contends that counsel failed to proffer mitigating evidence during the sentencing phase of the trial. Pet.Br. at 107. During the evidentiary hearing in this Court, counsel for Petitioner testified that attempts were made to contact Petitioner's relatives in order to convince them to come to Louisiana to testify. Evid.hear. at 111, 112. However, Petitioner's relatives neither acceded to the request nor did Petitioner desire that they be present. *Id.* Evidence of Petitioner's employment history was reiterated during the sentencing phase. *Id.* Counsel's representation of Petitioner at the sentencing phase was not inadequate.

6. The final argument raised under Claim 9 concerns counsel's alleged failure to apprise the various state courts of the relevance of the decision rendered in *State v. Williams,* 480 So.2d 721 (La.1985). Petitioner asserts that "had the Louisiana Supreme Court been apprised of the relevancy of *State v. Williams* to Mr. Lowenfield's conviction ...", such would have affected Petitioner's death sentence. Pet.Br. at 108. As noted above in the discussion of Claim 1, this Court is unable to conclude that the *Williams* decision lends support to Petitioner's cause. *See* Claim 1, *supra,* 426, 427. This Court notes that the Louisiana Supreme Court announced its decision in *State v. Williams* in May of 1985. The decision in Petitioner's case came down from the Louisiana Supreme Court in December of the same year. It is reasonable to conclude that the Louisiana Supreme Court was aware of and "apprised" of its own decision rendered in the same year. Petitioner was rendered effective assistance of counsel and argument six of Petitioner's ninth claim is without merit.

The Supreme Court has observed that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 104 S.Ct. at 2064. Here, Petitioner's counsel rendered competent legal services and did not undermine the adversarial process. The various issues raised within the Petitioner's ninth claim are without merit.

CLAIM 10 *The Identification Testimony of Diane Fauchaux*

Petitioner's tenth claim asserts that the identification testimony of Diane Fauchaux should have been suppressed because it was made after the use of "unduly suggestive tactics" by the police. Pet.Br. at 110. Petitioner claims that the present identification was violative of the principles discussed in *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

On review of this case, the Louisiana Supreme Court considered the *Brathwaite* decision in light of the facts and circumstances of the present case. The Court concluded that the identification was reliable. *Lowenfield*, 495 So.2d at 1253, 1254. Applying the same standards of *Brathwaite*, this Court finds that the indentification was reliable and admissable at trial. Witness Fauchaux had an unfettered view of Petitioner. In addition to her visual observations, she noticed Petitioner's accent. Trial Trans. Vol. VIII at 1923. Petitioner's tenth claim is without merit.

CLAIM 11 *The Trial Court's Refusal to Permit Petitioner to Recall Anita Jackson to the Stand*

■ Petitioner's eleventh claim centers on whether the trial court erred in denying counsel's request to recall Anita Jackson to the stand. Petitioner contends that said denial was in violation of his sixth amendment and fourteenth amendment rights. Pet.Br. at 112.

It is undisputed that Ms. Jackson was not a surprise witness in the case. Petitioner's counsel knew that Ms. Jackson would testify and was actually given copies of statements that Petitioner's counsel used to conduct its cross-examination of Ms. Jackson. *See* Trial Trans. Vol. VIII at 1944–1960; Pet.Exh.C. at 53. The trial court's denial of counsel's request did not abridge Petitioner's constitutional rights. Petitioner's eleventh claim is without merit.

CLAIM 12 *The Sufficiency of the Evidence for Proving Petitioner's Guilt Beyond A Reasonable Doubt*

Petitioner's twelfth claim contends that since his conviction was based on circumstantial evidence, there exists a "real and substantial doubt" concerning his guilt. Following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Louisiana Supreme Court rejected this same contention in the course of its careful review. *See* Pet.Br.Exh. C at 54–56. The review by the Louisiana Supreme Court comported with the guidelines set forth in *Jackson*. Further, the record contains a sufficient basis for "a rational factfinder ... [to] have found the petitioner guilty beyond a reasonable doubt ..." *Jackson*, 443 U.S. at 325, 99 S.Ct. at 2791. Petitioner's twelfth claim is without merit.

CLAIM 13 *The Comparative Appellate Review of Petitioner's Sentencing*

Petitioner's thirteenth claim seems to contend that Louisiana statutory law and state appellate procedures violated Petitioner's constitutional rights. Petitioner also makes bald assertions that the comparative review of his case was faulty under Supreme Court guidelines.

The procedures followed by the Louisiana Supreme Court in its comparative review of the present case evince no constitutional infirmities. *See Lowenfield*, 495 So.2d at 1260–61. On the same note, the Court "cannot say that the punishment is invariably disproportionate to the crime." *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976). Nothing within Louisiana's substantive or procedural laws or its appellate procedures denied Petitioner his federal constitutional rights. Petitioner's thirteenth claim is without merit.

CLAIM 14 *Electrocution as a Means of Punishment*

■ Petitioner's fourteenth claim avers that death by electrocution constitutes cruel and unusual punishment in violation of

the Eighth and Fourteenth Amendments of the United States Constitution. Pet.Br. at 114. Death by electrocution does not constitute cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *State v. Myles*, 389 So.2d 12 (La.1980). Petitioner's fourteenth claim is without merit.

CLAIM 15 *Capital Punishment as an Excessive Penalty*

Petitioner's fifteenth claim contends that capital punishment is an excessive penalty. As discussed under Claim 15, capital punishment is not an excessive penalty, *per se*, and capital punishment is not an excessive penalty within the confines of the present case. Petitioner's fifteenth claim is without merit.

CLAIM 16 *Petitioner's Alleged Cumulative Violations as a Source of Constitutional Infringement*

Petitioner's final argument asserts that the cumulative effect of the alleged infringements are violative of his constitutional rights. The Court has found that the arguments put forth in each of Petitioner's first fifteen claims do not, independently, mount a constitutional challenge by which this Court could set aside his conviction or sentence. This Court also finds that the collective allegations do not present a constitutional abridgment warranting action by this Court. Petitioner's sixteenth claim is without merit.

More than what these pages reflect has gone into this Court's consideration of the issues raised in this most serious of matters. This Court has been impressed by the diligence and professionalism of able counsel for Petitioner, and, indeed, for the State of Louisiana. A very wide-ranging consideration of all the issues has resulted from their respective input. All considered, the petition must be DENIED. Judgment accordingly.